NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-5112-12T2

JAMES B. HURWITZ, M.D.,

 Plaintiff-Appellant,

v.

AHS HOSPITAL CORP.[1] and
OVERLOOK HOSPITAL MEDICAL
STAFF,

 Defendants-Respondents.

APPROVED FOR PUBLICATION

November 24, 2014

APPELLATE DIVISION

Argued October 14, 2014 - Decided November 24, 2014

Before  Judges  Sabatino,  Simonelli,  and
Leone.

On appeal from the Superior Court of New
Jersey, Law Division, Union County, Docket
No. L-2194-11.

Philip  F.  Mattia  argued  the  cause  for
appellant  (Mattia  &  McBride,  P.C.,
attorneys; Mr. Mattia, of counsel and on the
briefs; Alex W. Raybould, on the brief).

Anthony  Cocca  argued  the  cause  for
respondents  (Bubb,  Grogan  &  Cocca,  LLP,
attorneys; Mr. Cocca, of counsel and on the
brief; Katelyn E. Cutinello, on the brief).

 The opinion of the court was delivered by

SABATINO, P.J.A.D.

---

[1] Improperly pled as Overlook Hospital.

This litigation arises out of a hospital's internal review and investigation of a surgeon after shortcomings were revealed in the care that surgeon had provided to certain patients. After extensive administrative hearings conducted within the hospital, in which the surgeon and his attorney participated, the hospital's Board of Trustees revoked the surgeon's clinical privileges. The surgeon contended that the actions taken against him by the hospital were arbitrary, unreasonable, and unduly punitive. He sought relief in the trial court, based on several legal theories.

The trial court dismissed the surgeon's lawsuit. In doing so, the court relied upon immunities from monetary damages conferred by federal and New Jersey statutes upon hospitals and the participants in peer review processes when evaluating a physician's performance and in making decisions about that physician's clinical privileges. See 42 U.S.C.A. §§ 11111 to 11112 and N.J.S.A. 2A:84A-22.10. The court found that plaintiff had failed to present sufficient evidence or indicia to overcome those statutory immunities. The court further ruled that plaintiff had not justified the taking of depositions, or the pursuit of other additional discovery, before the immunity issues were adjudicated.

For the reasons that follow, we affirm the trial court's dismissal of plaintiff's complaint, the rejection of his request to amend his pleadings a third time to amplify his allegations, and the court's determination that plaintiff had failed to justify additional discovery. In particular, we concur with the trial court that the hospital and the participants in the hospital's internal review processes are statutorily immune in this case from monetary liability. We further agree with the court that plaintiff has not identified sufficient grounds to establish that the hospital conducted its investigation without a reasonable basis for doing so, or that the hospital's revocation of plaintiff's privileges was imposed without a reasonable belief that such action was in furtherance of quality health care objectives.

Additionally, we sustain the trial court's ruling that plaintiff's conclusory allegations of wrongdoing by the hospital and the participants in the internal review process are insufficient to warrant depositions or the taking of other additional discovery. We hold that a challenger's right to obtain discovery, particularly depositions, in cases involving these immunity statutes is not absolute. Instead, the court may curtail discovery in its discretion if there are no reasonable

A-5112-12T2

indicia that a factual basis to surmount the immunities will be uncovered.

## I.

We derive the following chronology of events from the record, describing them solely to the extent that they are pertinent to the case-dispositive immunity questions raised before us.[2] In doing so, we acknowledge that plaintiff disagrees with some of the hospital's findings[3] of his deficient

---

[2] Prior to oral argument on the appeal, we invited counsel, sua sponte, to submit correspondence addressing confidentiality and privacy issues bearing upon the disclosure of certain information in the record. After receiving counsel's submissions, we granted defendants' motion to seal a confidential appendix submitted in connection with the appeal, which contains materials that the trial court had likewise sealed at defendants' request. Plaintiff did not oppose the sealing, provided that if the dismissal of his lawsuit were vacated by this court and the case remanded, the appellate sealing order would not foreclose his evidential use of the contents of the confidential appendix in the trial court. Defense counsel agreed with that proviso. Counsel also agreed that this court is not required under the applicable privacy or confidentiality laws to use initials or pseudonyms in this opinion for plaintiff himself or the names of the persons involved in the hospital's internal review process. However, counsel agreed, and we concur, that the names of the patients who are mentioned in the confidential appendix should be initialized and not revealed.

[3] Counsel agreed that the findings and recommendations contained within the confidential appendix may be freely quoted and referred to in this court's opinion. See, e.g., Wahi v. Charleston Area Med. Ctr., Inc., 562 F.3d 599, 610-11 (4th Cir. 2009) (quoting from various correspondence and peer review committee findings), cert. denied, 558 U.S. 1158, 130 S. Ct. 1140, 175 L. Ed. 2d 991 (2010); see also Poliner v. Tex. Health

(continued)

performance and that he vigorously contests the sanction of revocation that the Board of Trustees ultimately imposed.

#### Initial Review of Plaintiff's Performance and the Temporary Suspension of His Privileges

Plaintiff James B. Hurwitz, M.D., is a board-certified general surgeon licensed in the State of New Jersey. Plaintiff has been granted clinical privileges at several hospitals, including Overlook Hospital ("Overlook" or "the hospital"), where he first obtained privileges in 1998.

Eventually, concerns arose regarding the care that plaintiff had provided to certain patients at Overlook. As a result, in June 2010, the hospital's Chief of Surgery referred cases of two of plaintiff's patients for review by an outside

---

(continued)
Sys., 537 F.3d 368, 372-73 (5th Cir. 2008) (summarizing the findings of an Internal Medicine Advisory Committee and noting that the appellant doctor was found to have "(1) poor clinical judgment; (2) inadequate skills . . . ; (3) unsatisfactory documentation of medical records; and (4) substandard patient care"), cert. denied, 555 U.S. 1149, 129 S. Ct. 1002, 173 L. Ed. 2d 315 (2009); Gordon v. Lewistown Hosp., 423 F.3d 184, 194 (3d Cir. 2005) (quoting various findings of the hospital's internal hearing officer's report as well as other communications exchanged between the chairman of the credentials committee and the appellant doctor), cert. denied, 547 U.S. 1092, 126 S. Ct. 1777, 164 L. Ed. 2d 557 (2006); Singh v. Blue Cross/Blue Shield of Mass., Inc., 308 F.3d 25, 29-30 (1st Cir. 2002) (freely quoting from an internal "audit" of the appellant doctor's performance, which stated that "competent expert care was rarely seen" and that "documented treatment showed evidence of care somewhat below recognized standards of care").

expert, a faculty member at New York University School of Medicine. The outside reviewer is not affiliated with Overlook. Plaintiff was not concurrently informed that those cases had been sent out for review.

The outside reviewer issued a report in August 2010, opining that, with respect to one of the two patients in question, plaintiff had not been "proactive in managing [the patient's] care" and also that he had failed to "intervene when the clinical situation required." The reviewer reached similar conclusions with respect to the second patient. The reviewer recommended "counseling, monitoring, and consideration of restricting [plaintiff's] clinical privileges[,]" and if such measures had already been taken, "terminating [plaintiff's] privileges at Overlook Hospital."

Soon thereafter, on September 29, 2010, the hospital's Medical Executive Committee ("MEC") convened to consider authorizing an internal investigation into plaintiff's clinical competence. On that same day, the twenty-six MEC members in attendance unanimously voted in favor of commencing such a formal investigation.

The next day, September 30, 2010, the president of the hospital's medical staff issued a letter to plaintiff, notifying him that the MEC had begun the investigation. As a consequence

of the pending investigation, the president temporarily suspended plaintiff's clinical privileges. This temporary suspension was imposed pursuant to the hospital's bylaws.

The Chancery Division Action

Less than a week later, on October 1, 2010, plaintiff filed an action in the Chancery Division seeking injunctive relief to restrain and enjoin the hospital from suspending his privileges. Plaintiff then filed an amended complaint in the Chancery action, adding as a co-defendant the hospital's medical staff ("the Medical Staff"). The hospital and the Medical Staff filed opposition to the injunctive application.

After hearing initial oral argument, the Chancery Division judge presiding over the matter, Hon. John F. Malone, granted plaintiff's request for certain expedited discovery and scheduled further argument on the injunction. Among other things, Judge Malone directed defendants to provide plaintiff with a copy of the hospital's bylaws, written notice of the reasons for any adverse action taken or proposed, results of any investigation taken, medical charts, records, and any written report of the hospital's findings, including a "recitation of the [hospital's] actions and recommendations . . . and the basis for [plaintiff's] summary suspension without [a] hearing[.]" The judge declined to issue temporary restraints restoring

plaintiff's privileges.  Certain paper discovery, including responses to interrogatories, apparently were thereafter provided in the Chancery action, but no depositions were taken.

The Investigating Committee's Review

Meanwhile, as a follow-up to the September 2010 MEC meeting, the hospital created an Ad Hoc Investigating Committee ("the Investigating Committee"), appointed by the Medical Staff, to undertake the investigation and to submit a report with its findings and recommendations to the MEC.  Five physicians were named to the Investigating Committee.  The Investigating Committee met several times between October 2010 and December 2010.  Plaintiff was invited to provide written submissions, and he did so in a letter from his counsel and also in his own separate letter.  Plaintiff declined, however, three opportunities to meet with the Investigating Committee in person and to answer questions.

On December 20, 2010, the Investigating Committee issued its report, along with various recommendations.  The report noted that the Committee had reviewed plaintiff's care that he had provided to six patients over a year-and-a-half period. Based on its review of those six cases, the Investigating Committee reached certain unfavorable conclusions.  In particular, its report found that plaintiff's care was "notable

for poor documentation of care plans and delays in managing complications of surgery, which resulted in adverse outcomes." Given its findings, the Investigating Committee presented the following recommendation:

> Our recommendation is to remove [plaintiff] from the ER [Emergency Room] call schedule and to institute ad hoc review of 25 inpatient surgical cases [in which plaintiff had acted] as primary surgeon by the Surgical Care Review Committee. If [plaintiff's] performance of the cases were felt to be adequate, he would be able to return to the ER roster.

Dismissal of the Chancery Action

The hospital then filed a motion to dismiss plaintiff's Chancery action, in lieu of an answer, for failure to state a claim upon which relief can be granted, pursuant to Rule 4:6-2(e). That motion was granted on January 21, 2011.[4]

On the same day that Judge Malone granted the hospital's motion to dismiss the Chancery action, the MEC issued its decision based on the Investigating Committee's report. In a letter dated January 21, 2011, the MEC informed plaintiff that it had voted to impose a continued suspension of his privileges,

---

[4] The dismissal order recites that the Chancery action was dismissed "with prejudice," although the parties and the trial court did not treat the dismissal of the Chancery Division as a bar to plaintiff's subsequent litigation in the Law Division.

subject to various terms and conditions.  Specifically, the MEC stated as follows:

>After thoughtful consideration and deliberation, the MEC voted to impose <u>an additional suspension of your clinical privileges commencing upon your receipt of this notice for a minimum of three (3) months or until such time as you complete professional courses at your expense</u> approved by the MEC addressing Medical Ethics and Professionalism, Medical Record Documentation and General Surgical Review. <u>Upon completion of the suspension, your clinical privileges will be reinstated at which time you will be required to undergo a concurrent review of twenty-five (25) cases by a supervising surgeon</u> assigned by the Chairman of the Department of Surgery. During the concurrent review, you will be <u>ineligible for the Emergency Department on-call schedule, you will not be provided routine resident coverage for your patients, and any and all elective cases will require review and approval by the Chairman</u> of the Department of Surgery prior to scheduling a patient for the OR [Operating Room]  or otherwise admitting a patient to Overlook Hospital.

>[(Emphasis added).]

A little less than a month later, Judge Malone denied plaintiff's outstanding motion for a preliminary injunction.[5]

---

[5] The parties do not explain why the trial court issued an order denying plaintiff a preliminary injunction after the Chancery action was already dismissed, although we suspect that denial of the outstanding motion was issued for housekeeping reasons.

<u>Plaintiff's Law Division Complaint</u>

Although it is not entirely clear from the record, plaintiff apparently filed a new or a reinstated complaint in the Law Division some time between January 2011 and November 2011. Despite the fact that the Chancery action had already been dismissed in January 2011, plaintiff obtained an order in May 2011 "transferring" his case from the Chancery Division to the Law Division. Plaintiff also requested that his case be reassigned to the complex commercial track, pursuant to <u>Rule</u> 4:5A-2(b), so as to enable a lengthier period for discovery. That tracking request was granted.

In November 2011, the hospital moved to dismiss plaintiff's Law Division complaint, without prejudice, "pending a resolution or completion of the hospital['s] hearing and appeal process." The hospital noted that, under its applicable bylaws, plaintiff was entitled to a formal internal hearing to contest the MEC's investigative findings and recommendations. In fact, plaintiff had already requested such an internal hearing under the bylaws, and that hearing had begun.

Plaintiff did not oppose a without-prejudice dismissal of his Law Division action at that time. As his counsel represented to us, plaintiff agreed to such a dismissal to accommodate the hospital's internal administrative procedures,

in light of the costs and burdens of challenging the hospital's actions in two separate proceedings at the same time.

Consequently, plaintiff and the hospital entered into a Consent Order on January 19, 2012, dismissing plaintiff's Law Division action, expressly "without prejudice," pending a resolution or completion of the hospital's internal hearing and appeals process. Pursuant to the terms of the Consent Order, plaintiff was permitted to reinstate his amended complaint in the Law Division "without regard to any statute of limitations issues." Aside from this, the Consent Order specified that the parties "reserve[d] all rights concerning the claims and defenses."

The Hospital's Internal Hearings

The hospital's internal hearings began in June 2011. After a substantial delay of eight months due to scheduling conflicts of plaintiff's counsel, the hearings were resumed and completed February 2012.

The hearing panel consisted of three physicians and a presiding member from an outside organization. Both plaintiff and the MEC were represented by counsel. We are advised that fact and expert witnesses for both parties presented sworn

12                                                    A-5112-12T2

testimony to the panel, and were subject to cross-examination.[6] Documents were presented into evidence, including medical records of the specific patients whose cases were the subject of the MEC investigation. The parties submitted post-hearing briefs for the panel's consideration. A certified shorthand reporter prepared a verbatim transcript of the hearings.[7]

On May 2, 2012, the hearing panel issued its report. The panel concluded that plaintiff had been deficient in his care and treatment of the four patients whose cases it had reviewed. With regard to those patients, the panel concluded that plaintiff "in various respects, demonstrated poor surgical judgment, a lack of attentiveness to patients, untimely post-operative management of surgical complications and/or a failure to document thought processes and plans of care." In addition, the panel faulted plaintiff for, as it found, entering a note in

---

[6] In particular, we were advised at oral argument that plaintiff himself testified at the hearing and that he presented his own expert witness, although the limited record supplied to us is insufficient to confirm this.

[7] We have not been furnished with the hearing transcripts, but, as we explain, infra, they are not essential to our review of the legal issues being presented on this appeal.

the chart of one of those four patients, which "falsely indicated that [plaintiff] had met with the patient's mother."[8]

Based on its factual findings, the hearing panel recommended that the terms of plaintiff's suspension as set forth by the MEC should be adopted. The panel also indicated that more stringent sanctions beyond such a suspension were not warranted. More specifically, the panel recommended in its written report, in pertinent part:

> 3. [T]hat the suspension of [plaintiff's] clinical privileges and other restrictions imposed by the MEC were fair and reasonably necessary to protect the health and safety of patients . . . . [and]
>
> . . . .
>
> 5. The record does not support the imposition of greater sanctions on [plaintiff] than those imposed by the MEC, including the revocation of his clinical privileges.

### The Board of Trustees' Revocation of Plaintiff's Privileges

Pursuant to the hospital's bylaws, the hearing panel forwarded its report to the Board of Trustees. Focusing in particular upon the hearing panel's discrete finding that plaintiff had falsified a patient record, the Board of Trustees

---

[8] We were advised at oral argument that the hearing panel apparently found the testimony of the patient's mother more credible than that of plaintiff on the disputed question of whether such consultation had taken place.

revoked his clinical privileges, effective immediately. It conveyed that decision in a letter to plaintiff dated July 26, 2012. Plaintiff did not pursue any further appeal within the hospital of the Board of Trustees' decision, although the bylaws entitled him to appeal the decision to a "Review Panel composed of not fewer than three persons."

### Plaintiff's Motion to Reinstate His Law Division Case and Defendants' Motion to Dismiss

After the Board of Trustees informed him of its decision to revoke his privileges, plaintiff moved to reinstate his action in the Law Division but simultaneously moved to file a proposed Second Amended Complaint. His pleadings, as originally framed and then revised in the proposed Second Amended Complaint, asserted several legal theories for the recovery of damages, including breach of contract, breach of the implied covenant of good faith and fair dealing, and violation of plaintiff's due process rights.[9] Defendants opposed the reinstatement motion. They argued, among other things, that the proposed Second Amended Complaint failed to state a cause of action as a matter of law because of defendants' federal and state statutory immunities.

---

[9] In his last proposed amended complaint, plaintiff ultimately amended this allegation, given the absence of State action by defendants, to a claim of violation of "fundamental fairness."

After hearing oral argument, the Presiding Judge of the Law Division, Hon. Kenneth J. Grispin, entered an order on March 12, 2013, accompanied by a written Statement of Reasons, denying plaintiff's reinstatement motion, without prejudice. Specifically, Judge Grispin found in his Statement of Reasons that plaintiff's proposed Second Amended Complaint:

> [f]ailed to plead malice on the part of the hospital, or its staff, which was required to rebut the presumption of reasonableness pursuant to [42] U.S.C.A. § 11112(a). Moreover, [plaintiff's] proposed amended complaint fails to state a cause of action as to the Board for the very same reasons . . . . Similarly, [plaintiff's] alleged "due process" claim, contained in Count Three of the proposed amended complaint, cannot be sustained against a non-profit hospital.

Thereafter, plaintiff filed a motion for reconsideration and for leave to file a further amendment to his Law Division complaint. In support of his motion, plaintiff submitted a proposed Third Amended Complaint naming as defendants "AHS Hospital Corp.[10] Board of Trustees." The proposed pleading also names various fictitiously-named parties who have yet to be identified.

Following another round of oral argument, Judge Grispin denied plaintiff's motion for reconsideration. In a second

_____

[10] AHS Hospital Corporation evidently is the legal name of Overlook Hospital.

Statement of Reasons dated May 27, 2013, Judge Grispin concluded that plaintiff's proposed Third Amended Complaint still "failed to articulate sufficient facts which would demonstrate malice on the part of Overlook which unjustly prejudiced [plaintiff] or that the internal administrative hearing process was arbitrary or capricious." The judge granted defendants' cross-motion to dismiss the Law Division action, conclusively, specifying that the dismissal was "with prejudice."

The Contentions on Appeal

On appeal, plaintiff contends that the trial court acted prematurely in enforcing defendants' claimed immunities. He argues that the court should have afforded him an opportunity to conduct depositions, which he asserts might have uncovered admissible evidence to overcome the immunities and which potentially could demonstrate that defendants acted maliciously, arbitrarily, or unreasonably. Although his counsel acknowledged at the appellate oral argument that plaintiff had not handled the patient cases in question "perfectly," and that some degree of "remediation" of his conduct is appropriate, plaintiff asserts that the sanction of revocation imposed by the Board of Trustees is unduly harsh.

Plaintiff argues that the Board of Trustees' imposition of the sanction of revocation, which is more severe than the

17                                                    A-5112-12T2

conditional suspension recommended by the MEC and the hearing panel, circumstantially shows that the Board of Trustees engaged here in arbitrary and unreasonable decision-making. Plaintiff also contends that the hospital and its agents waived in the Consent Order their ability to oppose the reinstatement of his lawsuit.

Plaintiff therefore urges that the trial court's dismissal order be vacated. In particular, he seeks to have his lawsuit reinstated for the completion of discovery and for a decision on the merits with a fuller record.

In response, defendants maintain that the trial court correctly enforced the terms mandated by and the public policies reflected in the federal and state immunity statutes. Those statutes, defendants emphasize, are designed to protect hospitals and the participants in internal peer reviews from having monetary liability to doctors who are sanctioned as a result of such internal processes. Defendants further submit that they did not waive in the Consent Order their right to oppose a reinstatement of plaintiff's lawsuit on legal grounds, here being the substantive immunities they are afforded under the federal and state statutes.

Defendants further assert that the trial court sensibly rejected plaintiff's request to conduct depositions and to

pursue other discovery. They maintain there is no indication in the record, apart from plaintiff's conclusory assertions and suspicions, that the hospital or its representatives engaged here in the sort of ill-founded or nefarious behavior that could nullify their statutory immunities.

## II.

The critical focus of this appeal centers upon the application of the federal and state immunities that have been invoked by defendants. We begin our analysis with an examination of the federal statutory provisions, 42 U.S.C.A. §§ 11111 to 11112.

The federal immunities are part of the larger Healthcare Quality Improvement Act of 1986 ("HCQIA"), 42 U.S.C.A. §§ 11101 to 11152, which provides, in relevant part, that in a "professional review action of a professional review body . . . (A) the professional review body, (B) any person acting as a member or staff to the body, (C) any person under a contract or other formal agreement with the body, and (D) any person who participates with or assists the body with respect to the action" shall not be liable in damages under any law "with respect to [any review] action," 42 U.S.C.A. § 11111(a)(1), if the review action is taken:

(1) in the reasonable belief that the action was in the furtherance of quality health care,

(2) after a reasonable effort to obtain the facts of the matter,

(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and

(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

[42 U.S.C.A. § 11112(a).]

A "professional review body," as that term is used in the HCQIA, is broadly defined. The term encompasses "a health care entity and the governing body or any committee of a health care entity which conducts professional review activity, and includes any committee of the medical staff of such an entity when assisting the governing body in a professional review activity." 42 U.S.C.A. § 11151(11).

A "professional review action," defined earlier in the HCQIA, consists of:

an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a

patient or patients), <u>and which affects (or may affect) adversely the clinical privileges</u>, or membership in a professional society, of the physician. Such term includes a formal decision of a professional review body not to take an action or make a recommendation described in the previous sentence and also includes professional review activities relating to a professional review action.

[42 <u>U.S.C.A.</u> § 11151(9) (emphasis added).]

Further, the HCQIA defines "professional review activity" to cover any activity of a health care entity with respect to an individual physician conducted "(A) to determine whether the physician may have clinical privileges with respect to, or membership in, the entity, (B) to determine the scope or conditions of such privileges or membership, or (C) to change or modify such privileges or membership." 42 <u>U.S.C.A.</u> § 11151(10).

Significantly, the HCQIA imposes a rebuttable presumption that an adverse professional review action undertaken by a hospital against a physician is protected by the immunity. As the statute recites, "[a] professional review action shall be presumed to have met the preceding standards necessary for the protection set out in section [42 <u>U.S.C.A.</u> § 11111(a)] unless the presumption is rebutted by a preponderance of the evidence." 42 <u>U.S.C.A.</u> § 11112(a). The only specified qualification to this broad immunity coverage, then, is if a plaintiff demonstrates, by a preponderance of the evidence, that the

21

defendant took action without a reasonable belief in initiating the action, failed to provide adequate notice and hearing procedures, or otherwise took action without a reasonable belief it was warranted by the facts after a reasonable investigation. See 42 U.S.C.A. § 11112(a)(1) to -(4).

"HCQIA immunity is a question of law for the court to decide and may be resolved whenever the record in a particular case becomes sufficiently developed." Bryan v. James E. Holmes Reg'l Med. Ctr., 33 F.3d 1318, 1332 (11th Cir. 1994) (emphasis added), cert. denied, 514 U.S. 1019, 115 S. Ct. 1363, 131 L. Ed. 2d 220 (1995). As the House of Representatives Committee that took part in the HCQIA's passage explained:

> The [immunity] provisions would allow a court to make a determination that the defendant has or has not met the standards specified in section [11112(a)]. The Committee intends that the court could so rule even though other issues in the case remain to be resolved. For example, a court might determine at an early stage of litigation that the defendant has met the [section 11112(a)] standards, even though the plaintiff might be able to demonstrate that the professional review action was otherwise improper. At that point, it would be in order for the court to rule on immunity. In such a case, the court could still proceed to determine whether injunctive, declaratory, or other relief would be in order.
>
> [Ibid. (quoting H.R. Rep. No. 99-903, at 12 (1986), reprinted in 1986 U.S.C.C.A.N. 6394 (emphasis added)).]

A-5112-12T2

This immunity from monetary liability has been enforced repeatedly by the federal and state courts, aside from exceptional instances where the immunity has been overcome. See, e.g., Osuagwu v. Gila Reg'l Med. Ctr., 850 F. Supp. 2d 1216, 1239 (D.N.M. 2012) (finding that HCQIA immunity should not apply because plaintiff was not "given a fair opportunity to confront and cross-examine the anonymous physicians who prepared the peer-review forms," and because the peer review panel was not impartial, given that one of the reviewers was an "accuser, investigator, prosecutor, and one of [the plaintiff's] judges [at the hearing]"); see also Colantonio v. Mercy Med. Ctr., 901 N.Y.S.2d 370, 374 (App. Div. 2010) (finding that the defendants were not clearly entitled to immunity because there remained a "triable issue of fact as to whether, at the meeting of the Committee, some defendants knowingly provided false information").

Recognizing the strong legislative policy underlying 42 U.S.C.A. § 11111, the Eleventh Circuit has cautioned that the proper role of courts on review of peer review decisions "is not to substitute our judgment for that of the hospital's governing board or to reweigh the evidence regarding the renewal or termination of medical staff privileges." Bryan, supra, 33 F.3d at 1337. Other courts applying the statute have expressed

comparable deference to hospitals, their peer reviewers, and their internal decision-makers. See, e.g., Harris v. Bradley Mem. Hosp. & Health Ctr., 50 A.3d 841, 858 (Conn. 2012) (noting that in enacting the HCQIA, Congress intended to "resolve the question of immunity under the federal act as early as possible and to reinforce judicial deference to hospital decision-making"), cert. denied, 133 S. Ct. 1809, 185 L. Ed. 2d 812 (2013).

Similar public policies are reflected in our State's cognate immunity statute, N.J.S.A. 2A:84A-22.10. Like the federal law, the New Jersey statute provides broad immunity for damages to qualified persons for actions taken as part of a hospital's peer review process. As is relevant here, N.J.S.A. 2A:84A-22.10 provides that:

> Any person who serves as a member of, is staff to, under a contract or other formal agreement with, participates with, or assists with respect to an action of:
>
> . . . .
>
> d. A hospital peer review committee having the responsibility for the review . . . of matters concerning the limiting the scope of hospital privileges . . .
>
> . . . .
>
> shall not be liable in damages to any person for any action taken or recommendation made by him within the scope of his function with the committee, subcommittee or society in

24                                                      A-5112-12T2

the performance of said peer-review, ethics, grievance, judicial, quality assurance or professional relations review function, <u>if such action or recommendation was taken or made without malice and in the reasonable belief after reasonable investigation that such action or recommendation was warranted upon the basis of facts disclosed</u>.

[(Emphasis added).]

Although <u>N.J.S.A.</u> 2A:84A-22.10 was adopted in 1979, it has been cited only infrequently in published case law, at times just in passing.[11] None of those cases has specifically addressed the legal questions presented here concerning the evidentiary burden of a party seeking to overcome the immunity, and what, if any, discovery, such a challenger is entitled to obtain before the trial court rules on a defendant's motion to dismiss based upon the New Jersey immunity.[12]

---

[11] <u>See, e.g.</u>, <u>Patel v. Soriano</u>, 369 <u>N.J. Super.</u> 192, 251 n.15 (App. Div.) (noting the statutory immunity provided to a "hospital performing its credentialing function on applicants for surgical privileges"), <u>certif. denied</u>, 182 <u>N.J.</u> 141 (2004); <u>see also</u> <u>Bainhauer v. Manoukian</u>, 215 <u>N.J. Super.</u> 9, 38 (App. Div. 1987) (mentioning the conditional privilege afforded to physicians involved in hospital peer review but resolving the underlying lawsuit on other grounds).

[12] If, in fact, the federal immunity protects defendants, then there is no need to reach the application of the overlapping state-law immunity.

Having canvassed these key aspects of the federal and state immunity statutes, we now consider the propriety of the trial court's dismissal of plaintiff's complaint seeking monetary damages.[13] We also examine the related question of whether the court's enforcement of defendants' immunities, thereby leaving plaintiff without further discovery, was premature. Before delving into that analysis, we dispose first of two procedural matters.

A.

First, we reject plaintiff's argument that the Consent Order should be construed as a waiver of defendants' right, based on their federal and state immunities, to oppose plaintiff's claims. The terms of the Consent Order cannot be reasonably interpreted to bar defendants from interposing their immunity arguments. The plain language of the Consent Order provides that the parties "reserve all rights concerning the claims and defenses." (emphasis added).

A consent order is, in essence, an agreement of the parties that has been approved by the court. As the Supreme Court has

---

[13] Plaintiff's complaint in the Law Division deleted his request that he had made earlier in the Chancery Division for the equitable relief of reinstatement of his clinical privileges. Hence, the only specified relief that he now seeks is monetary damages.

consistently noted, one of the "'fundamental canons of contract construction require that we examine the plain language of the contract and the parties' intent, as evidenced by the contract's purpose and surrounding circumstances.'" Highland Lakes Country Club & Cmty., Ass'n v. Franzino, 186 N.J. 99, 115 (2006) (quoting State Troopers Fraternal Ass'n v. New Jersey, 149 N.J. 38, 47 (1997) (citations omitted)). The plain language of the Consent Order here is not ambiguous, nor is it obscured by the surrounding circumstances. Defendants clearly did not forfeit in the Consent Order their right to invoke their statutory immunities, or their right to invoke them as soon as the litigation was reactivated.

Moreover, our Court Rules explicitly state that a request to dismiss for failure to state a claim "may be made in any pleading permitted or ordered or by motion for summary judgment or at the trial on the merits." R. 4:6-7 (emphasis added). Thus, by its very terms, Rule 4:6-7 permits a party to raise the defense of a failure to state a claim as late as trial, as well as sooner on motion. See Buteas v. Raritan Lodge No. 61 F. & A.M., 248 N.J. Super. 351 (App. Div. 1991); see also Pressler & Verniero, Current N.J. Court Rules, cmt. 1 on R. 4:6-7 (2015) (stating that a defense under Rule 4:6-2(e) "may be raised as late as trial"). We further note that defendants did, in fact,

assert the defense of failure to state a claim in response to plaintiff's amended verified complaint that he had filed earlier in the Law Division, albeit in a footnote in their motion papers, before the Consent Order was entered.

We recognize that defendants agreed in the Consent Order that plaintiff could reinstate his amended complaint. However, as plaintiff stated at the appellate argument, he sought to "reinstate" not his First Amended Complaint but his Second Amended Complaint. In any event, had defendants acceded to reinstatement of his First Amended Complaint and then opposed further amendment or moved to dismiss, the end result would have been the same.

### B.

A second preliminary facet that we must address is the appropriate procedural context in which to evaluate defendants' case-dispositive motion. To be sure, defendants' motion was couched as a motion to dismiss under Rule 4:6-2(e) for failure to state a claim upon which relief may be granted. However, both parties in their submissions respecting that motion, as well as the trial court, made reference to and relied upon documentary materials from the hospital's internal review process. Those materials were beyond the four corners of the complaint, although excerpts of them were quoted or referred to

28                                          A-5112-12T2

in the complaint. In his ruling, the judge at times referred to the entire record presented to him, which clearly went beyond the discrete excerpts quoted and otherwise referred to in the pleadings. As such, defendants' motion to dismiss most properly should be conceived as a dismissal motion converted to a motion for summary judgment under Rule 4:46-1 to -6, as is permitted under the last sentence of Rule 4:6-2.[14]

Viewed properly in this more expansive context, we must evaluate the record before us under the customary standards of summary judgment practice. See Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995). In particular, we are to read the record in a light most favorable to plaintiff and accord all favorable inferences to plaintiff that can be reasonably drawn from that record. See R. 4:46-2; Brill, supra, 142 N.J. at 540; see also Murray v. Plainfield Rescue Squad, 210 N.J. 581, 584 (2012) (applying the same Rule 4:46 standards on appellate review of a summary judgment order). Upon doing so, we are satisfied, for the reasons we explain, infra, that the trial

---

[14] R. 4:6-2 ("If, on a motion to dismiss based on the defense numbered (e), matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided by R. 4:46, and all parties shall be given reasonable opportunity to present all material pertinent to such a motion.").

court's entry of final judgment in defendants' favor was sound and not premature.[15]

## C.

We turn to the substance of the immunity arguments. Even viewing the record in a light most favorable to plaintiff, we agree with Judge Grispin that defendants are entitled to immunity from damages as a matter of federal and New Jersey statutory law, and that plaintiff has failed to present a sufficient basis to vault those immunities.

As Judge Grispin correctly found, defendants are clearly within the presumptive scope of the federal immunity under the HCQIA. The hospital's internal review of plaintiff's performance unquestionably comprises a "professional review activity" under 42 U.S.C.A. § 11151(10). The participants in the review, including the Medical Staff, the Investigating Committee, the MEC, the hearing panel, and the Board of Trustees are all "professional review bodies" within the ambit of the

---

[15] Even if, for the sake of discussion, the standards for dismissal under Rule 4:6-2(e) are applied here rather than the summary judgment standards, see, e.g., Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 746 (1989), we remain persuaded that the immunity statutes control this case and mandate dismissal of the lawsuit. "A pleading should be dismissed if it states no basis for relief and discovery would not provide one." Rezem Family Assocs., L.P. v. Borough of Millstone, 423 N.J. Super. 103, 113 (App. Div.), certif. denied, 208 N.J. 366 (2011).

statute.  See 42 U.S.C.A. § 11151(11).  The various recommendations and decisions to impose sanctions upon plaintiff — initially a recommended suspension and ultimately the Board of Trustees' revocation of plaintiff's clinical privileges — comprise "professional review actions" as defined under 42 U.S.C.A. § 11151(9), because they adversely affected plaintiff's status at the hospital.

As we have already noted, defendants and the other participants in the hospital's internal review process are presumptively immune under the HCQIA from monetary damages if they acted in "the reasonable belief that the[ir] action[s] were in the furtherance of quality health care," 42 U.S.C.A. § 11112(a)(1), "after a reasonable effort to obtain the facts of the matter," 42 U.S.C.A. § 11112(a)(2), after "adequate notice and hearing procedures are afforded to the physician . . . or after such other procedures as are fair to the physician under the circumstances," 42 U.S.C.A. § 11112(a)(3), and with a "reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts" and after appropriate notice and fair procedures.  42 U.S.C.A. § 11112(a)(4).

More simply stated, the federal immunity presumptively governs this case, so long as the hospital and its participants

A-5112-12T2

proceeded in a fair and reasonable manner and with a reasonable belief that the actions taken were in furtherance of quality health care and warranted by the facts. The record provides no evidence, nor even a plausible indication, that defendants failed to comport with these norms of fairness and reasonableness. Plaintiff failed to carry his burden to rebut the presumption, or even create a material issue of fact.

The judicial power to intervene in disputes over a physician's clinical privileges is circumscribed. As this court held almost thirty years ago in an opinion coincidentally involving another physician whose privileges had been terminated at Overlook, "[j]udicial review of hospital decisions regarding admission to medical staff, extent of privileges and termination is very limited." Zoneraich v. Overlook Hosp., 212 N.J. Super. 83, 90 (App. Div.), certif. denied, 107 N.J. 32 (1986). "Hospital officials are vested with wide managerial discretion, to be used to elevate hospital standards and to better medical care." Ibid. (citing Greisman v. Newcomb Hosp., 40 N.J. 389, 403 (1963)). "So long as hospital decisions concerning medical staff are reasonable, are consist[e]nt with the public interest, and further the health care mission of the hospital, the courts will not interfere." Ibid. (citing Desai v. St. Barnabus Med. Ctr., 103 N.J. 79 (1986), and Belmar v. Cipolla, 96 N.J. 199,

208 (1984)). Although <u>Zoneraich</u> did not involve the HCQIA (which, as it so happened, was enacted by Congress that same year), these same general principles pertain in applying that federal immunity.

That said, our courts have also recognized that "a physician is entitled to fundamentally fair procedures in a non-profit hospital's consideration of staff membership, the extent of privileges and termination." <u>Id.</u> at 91. Accordingly, the hospital seeking to suspend or oust a physician must provide notice to the affected physician of the charges or the hospital's proposed action before an internal hearing. <u>Ibid.</u> "The tribunal must be fair and unbiased." <u>Ibid.</u> The physician has a qualified right to retain counsel and a right to disclosure of certain information, "<u>limited by</u> recognition of competing rights to privilege and confidentiality." <u>Ibid.</u> (emphasis added) (citing <u>Garrow v. Elizabeth Gen. Hosp. & Dispensary</u>, 79 <u>N.J.</u> 549, 566-68 (1979)).

As our Supreme Court noted in <u>Garrow</u> and we reiterated in <u>Zoneraich</u>, "[j]udicial review of a hospital board action 'should properly focus on <u>the reasonableness</u> of the action taken in relation to the several interests of the public, the [physician], and the hospital.'" <u>Zoneraich</u>, <u>supra</u>, 212 <u>N.J. Super.</u> at 91 (emphasis added) (quoting <u>Garrow</u>, <u>supra</u>, 79 <u>N.J.</u> at

565). Because of the internal nature of the hospital's private hearing, "'[t]he proper standard upon review is not identical with that customarily applied to administrative agencies, that is, substantial competent credible evidence.'" Ibid. (quoting Garrow, supra, 79 N.J. at 565). "'However, the record should contain sufficient reliable evidence, even though of a hearsay nature, to justify the result.'" Ibid. (quoting Garrow, supra, 79 N.J. at 565).

The HCQIA likewise affords deference to hospitals and their representatives when they make these difficult decisions concerning a physician's clinical privileges. That deference is manifested by the federal law's express presumption that the immunity from damages applies unless the physician challenging the hospital's adverse decision proves, by a preponderance of the evidence, that the decision-makers took action without a reasonable belief that it was in furtherance of quality health care, failed to provide adequate notice and hearing procedures, or took action without a reasonable belief based on the facts known after a reasonable investigation. See 42 U.S.C.A. § 11112(a).

The "reasonable belief" concepts in subsections (a)(1) and (a)(4) of Section 11112 are objective standards. In fact, as the House Committee report explains, the drafters of the federal

immunity revised the bill to replace a "good faith" requirement contained in an earlier version to "a more objective 'reasonable belief'" standard. H.R. Rep. No. 99-903, at 10 (1986), reprinted in 1986 U.S.C.C.A.N. 6392-93. The Committee noted "concerns that 'good faith' might be misinterpreted as requiring only a test of the subjective state of mind of the physicians conducting the professional review action." Ibid. The Committee further declared its intention that the "reasonable belief" test "will be satisfied if the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their action would restrict incompetent behavior or would protect patients." Ibid. The Committee also expressed its "belief that this standard will be met in the overwhelming majority of professional review actions[.]" Ibid. (emphasis added). Consistent with the drafters' intent, case law has repeatedly treated the "reasonable belief" test under the statute as an objective test.[16]

---

[16] See, e.g., Cohlmia v. St. John Med. Ctr., 693 F.3d 1269, 1277 (10th Cir. 2012) ("The entity or persons that undertake the professional review are immune under HCQIA as long as they substantially comply with a list of objective standards set forth in the Act."); Poliner, supra, 537 F.3d at 377 ("[T]he HCQIA's 'reasonableness requirements were intended to create an objective standard of performance, rather than a subjective good faith standard.'"); Gordon, supra, 423 F.3d at 205 ("[I]mmunity (continued)

A-5112-12T2

The HCQIA does not specify that a reviewing court must be provided with transcripts of the hospital's internal hearing in order to evaluate the adequacy of the hospital's proceedings. Although we recognize that the trial court in Zoneraich was apparently supplied with a record of the hospital's internal proceedings, we do not construe the HCQIA to require that such transcripts be furnished in every case. The transcripts are not vital where, as here, the other documents provided to the court sufficiently establish that the physician was afforded a fair and reasonable opportunity to be heard, and show that the hospital's ultimate decision was reasonably attained based upon factual determinations generated from those internal hearings.

N.J.S.A. 2A:84A-22.10 extends a similar form of immunity protection for hospitals, peer reviewers, and decision-makers.

---

(continued)
will be judged by applying the objective standard regarding whether the Hospital based its actions upon the reasonable belief that they are in furtherance of quality healthcare."); Meyers v. Columbia/HCA Healthcare Corp., 341 F.3d 461, 468 (6th Cir. 2003) ("[The HCQIA] is an objective standard, rather than a subjective good faith requirement."); Freilich v. Upper Chesapeake Health, 313 F.3d 202, 212 (4th Cir. 2002) ("[T]he HCQIA's objective reasonableness standard is a perfectly valid guide for peer review bodies."); Singh, supra, 308 F.3d at 32 ("[S]ister circuits have uniformly applied all the sections of § 11112(a) as objective standards"); Sugarbaker v. SSM Health Care, 187 F.3d 853, 857 (8th Cir. 1999) ("[T]he reasonableness requirements contained in section 11112(a) necessitate an objective inquiry."), cert. denied, 528 U.S. 1137, 120 S. Ct. 980, 145 L. Ed. 2d 931 (2000).

The provision broadly covers "any person" involved in such review of a physician "for any action taken or recommendation made by [that person] within the scope of [that person's] function" in that role. N.J.S.A. 2A:84A-22.10(e). This state-law immunity applies, so long as "such action or recommendation was taken or made without malice and in the reasonable belief after reasonable investigation that such action or recommendation was warranted upon the basis of facts disclosed." N.J.S.A. 2A:84A-22.10(e) (emphasis added).[17]

Although the term "malice" is not defined within N.J.S.A. 2A:84A-22.10, the conventional meaning of that term suggests that the sanctioned physician must prove that the hospital defendants acted, in essence, either with ill will, without just cause,[18] or with a reckless disregard of the truth of the facts

---

[17] Unlike the federal statute, the New Jersey statute does not contain an express presumption that the state-law immunity controls and must be overcome by the plaintiff.

[18] In other contexts, malice "is defined as 'the intentional doing of a wrongful act without just cause or excuse.'" LoBiondo v. Schwartz, 199 N.J. 62, 93-94 (2009) (quoting Jobes v. Evangelista, 369 N.J. Super. 384, 398 (App. Div.) (defining malice in the context of a malicious prosecution case), certif. denied, 180 N.J. 457 (2004)); see also Lamorte Burns & Co. v. Walters, 167 N.J. 285, 306 (2001) (noting, in the context of tortious interference, that "malice" means that "harm was inflicted intentionally and without justification or excuse").

regarding the physician's quality of care.[19]  The "reasonable belief" aspect of the New Jersey statute is also undefined.  We discern no basis to construe it any differently than the federal immunity statute's usage of that term.

We have no doubt that plaintiff was provided here with a procedurally fair opportunity to be heard during the hospital's internal process.  He was given multiple opportunities to provide written submissions to the hospital's reviewers and decision-makers.  He was advised before the formal hearing conducted by the hearing panel of the specific patient cases that would be the subject of review.  He was represented in the internal hearings by able and experienced counsel who is a certified civil trial attorney.  He apparently testified and also presented his own expert witness.  The findings of the Investigating Committee and, thereafter, of the hearing panel, were clearly detailed in writing.

By all indications, these procedures comported with the HCQIA, the New Jersey statute, and case law.  It is not as if plaintiff had been abruptly summoned before the Board of Trustees without warning and summarily stripped of his privileges for no articulated reasons.  To the contrary, the

---

[19] See, e.g., DeAngelis v. Hill, 180 N.J. 1, 13 (2004) (applying such a notion of "malice" in the context of a defamation case).

Board's final decision was the culmination of a lengthy and elaborate process, one in which plaintiff had many opportunities to present opposition and, presumably, to settle the matter on the terms recommended in succession by the internal reviewers.

Attempting to meet his burden to establish unreasonableness or other improper conduct, plaintiff points to three aspects of the chronology that he contends are indicia that defendants' statutory immunities should be overcome. He specifically alleges in his reply brief that: (1) defendants did not have a reasonable belief that their actions as to him were in the furtherance of quality health care; (2) they failed to provide him with adequate notice of the first investigation and of the initial referral to the outside reviewer; and (3) they lacked a reasonable belief that the sanctions recommended and imposed were warranted. As to that latter point, plaintiff emphasizes that the sanction of revocation ultimately imposed by the Board of Trustees was harsher than the conditional suspension recommended by both the MEC and the hearing panel. We concur with the trial court that there is no merit to these contentions of unfairness.

The record provides an ample basis to justify the hospital's decision to pursue a review of the care that plaintiff had provided to several of his patients. Indeed,

39                                                    A-5112-12T2

those concerns were borne out by the adverse findings of the outside reviewer, the Investigating Committee, and the hearing panel. The documents in the appendices readily show that defendants had a reasonable basis to believe that the professional review and remedial action they took was pursued to further the quality of health care being provided to the hospital's patients.

In general, the applicable nexus to the "quality of health care" will be satisfied under the HCQIA if the reviewing body, based on the information before it, "would reasonably have concluded that [its] action would restrict incompetent behavior or would protect patients." Gordon, supra, 423 F.3d at 202 (quoting H.R. Rep. No. 99-903, at 10 (1986), reprinted in 1986 U.S.C.C.A.N. 6393). As the Fifth Circuit has noted, the HCQIA "does not require that the professional review result in an actual improvement of the quality of health care, nor does it require that the conclusions reached by the reviewers were in fact correct." Poliner, supra, 537 F.3d at 378 (quoting Imperial v. Suburban Hosp. Ass'n, Inc., 37 F.3d 1026, 1030 (4th Cir. 1994)). That observation is consistent with the fact that Congress prescribed, under 42 U.S.C.A. § 11112(c), that a professional review board may immediately suspend clinical privileges "where the failure to take such an action may result

in an imminent danger to the health of any individual." Ibid. As the Third Circuit has observed, "the good or bad faith of the reviewers [under the HCQIA] is irrelevant." Brader v. Allegheny Gen. Hosp., 167 F.3d 832, 840 (3d Cir. 1999) ("Brader II").

At the time its nearly year-long review process began, the hospital had outstanding concerns regarding plaintiff's management of his patients and his documentation of their treatment. Indeed, as the outside reviewer concluded in his report, plaintiff "either did not understand the appropriate steps in management or approached the situation too passively. Neither is acceptable." Moreover, plaintiff himself acknowledged in his Second Amended Complaint that two of his patients "had recognized complications associated with their surgeries." The fact that those patients eventually recovered is not dispositive. The record manifestly shows that the hospital's initiation of the review process was reasonable.

We also reject plaintiff's next claim that defendants are disentitled to immunity because they failed to provide him with advance notice of the first steps of the outside review and investigation. As federal case law instructs, "nothing in the [HCQIA] requires that a physician be permitted to participate in the review of his [own patient's] care." Singh, supra, 308 F.3d at 44 (citation omitted). The HCQIA applies to "discrete

41

decisions, not an on-going course of conduct."  Wojewski v. Rapid City Reg'l Hosp., Inc., 730 N.W.2d 626, 636 n.9 (S.D. 2007) (applying the HCQIA's immunities).

Plaintiff's third argument, contending that defendants lacked a reasonable belief that the sanctions against him were actually warranted, is similarly flawed.  He contends that the Board of Trustees "consistently and inexplicably disregarded" the independent recommendations made regarding his performance. In his view, the Board of Trustees did not possess a reasonable belief that its decision to revoke his privileges was warranted. The trial judge rejected this specious assertion, and so do we.

Courts generally agree that "the reversal of a peer review committee's recommendation of an adverse professional review action by a higher level peer review panel does not indicate that the initial recommendation was made without a reasonable belief that the recommendation would further quality health care."  Singh, supra, 308 F.3d at 41 (citing Austin v. McNamara, 979 F.2d 728, 735 (9th Cir. 1992) (granting immunity in a situation where a hospital's judicial review committee overturned a medical executive committee's recommendation of an adverse professional review action)).  The converse is also true.

The mere fact that, as plaintiff's counsel's phrased it at oral argument before us, the hospital decision-makers "ratcheted up" the sanctions as the matter progressed does not signify that the Board of Trustees or the other hospital decision-makers acted unreasonably or maliciously. In the motion arguments below, Judge Grispin aptly analogized the present case to attorney discipline cases, in which the Supreme Court sometimes imposes a harsher ultimate sanction on a licensee than that recommended by the Disciplinary Review Board.[20] The ultimate authority to make privilege decisions within the hospital rests with the Board of Trustees under the hospital's bylaws, and the Board's selection of a harsher penalty in this case does not mean that it acted maliciously or unreasonably.

The Board had a reasonable cause for serious concern after the hearing panel concluded from the testimony it heard that plaintiff had made a false entry on a patient chart. Whether or not that discrete finding is actually true is beyond our limited

---

[20] Although the Supreme Court "ordinarily place[s] great weight on the recommendation of the Disciplinary Review Board," the Court "[does not] not hesitate to impose a more severe sanction than that recommended by the Board when circumstances warrant." In re Kushner, 101 N.J. 397, 403 (1986) (citations omitted) (finding the attorney's false certification a "grave misconduct" and elevating the Disciplinary Review Board's recommended one-year suspension to three years); see also In re Rosen, 88 N.J. 1, 3 (1981) (finding the attorney's subornation of perjury "inexcusable and reprehensible" and elevating the Disciplinary Review Board's proposed one-year suspension to three years).

scope of review.  True or not, the finding alone reasonably supported the Board of Trustees' discretionary decision to revoke plaintiff's privileges.  Moreover, plaintiff apparently bypassed numerous opportunities to resolve this matter with the lesser sanctions recommended by the MEC, the Investigating Committee, and the hearing panel before the matter reached the Board level.

D.

As a final matter, we consider plaintiff's argument that the trial court acted prematurely in dismissing his lawsuit without further discovery, particularly in denying his request for the depositions of persons involved in the hospital's review, investigation, and decision-making process.  We are satisfied that Judge Grispin did not misapply his discretion in curtailing further discovery and in adjudicating the immunities of defendants on the law and on the record supplied to him.

Neither the HCQIA nor N.J.S.A. 2A:84A-22.10 specifies what amount of discovery, if any, is warranted before a trial court may adjudicate the merits of the immunities invoked by a hospital or individual defendants who participated in the review of a physician's clinical privileges.  We are mindful, however, of the House Committee's guidance that the immunity question under the HCQIA may be resolved at "an early stage of

44                                              A-5112-12T2

litigation," and that court may do so "even though other issues in the case remain to be resolved."  H.R. Rep. No. 99-903, at 12 (1986), reprinted in 1986 U.S.C.C.A.N. at 6394.

The federal cases display no consistent pattern in the level of discovery afforded to physicians who challenge hospital defendants' assertions of HCQIA immunity.  In some instances, the federal courts have found that the plaintiff physician was entitled to limited discovery of the peer review process.  See, e.g., Wahi v. Charleston Area Med. Ctr., Inc., 453 F. Supp. 2d 942, 948 (S.D. W. Va. 2006) (authorizing limited discovery, in the form of numerically-capped interrogatories, requests for admissions, and time-limited depositions), aff'd, 562 F.3d 599 (4th Cir. 2009), cert. denied, 558 U.S. 1158, 130 S. Ct. 1140, 175 L. Ed. 2d 991 (2010); Teasdale v. Marin Gen. Hosp., 138 F.R.D. 691, 694 (N.D. Cal. 1991) (authorizing the production of peer review documents); see also Sugarbaker, supra, 187 F.3d at 857 (noting that the trial court had allowed depositions of persons involved in the hospital's peer review process, where the reasonableness of that process, including claims of antitrust violations by the defendants, had been plausibly challenged by plaintiff).

Conversely, in some instances, the HCQIA immunity issues were resolved by the trial court at an early stage by granting a motion to dismiss for failure to state a claim upon which relief may be granted.  See, e.g., Straznicky v. Desert Springs Hosp., 642 F. Supp. 2d 1238, 1240 (D. Nev. 2009) (granting dismissal of plaintiff's damage claims, with prejudice, based solely on the allegations of the plaintiff's complaint and related documents that the plaintiff physician had supplied to the court in connection with his motion for a temporary restraining order); Sobel v. United States, 571 F. Supp. 2d 1222, 1229 (D. Kan. 2008) (granting the defendants' motion to dismiss under the HCQIA on the face of the pleadings, finding, among other things, that the plaintiff physician had not asserted sufficient grounds to overcome the statute's presumption of immunity).

At the very least, the question of immunity under the HCQIA may be resolved in appropriate cases at the summary judgment stage.  As the Ninth Circuit has observed, because the "reasonableness" requirements of 42 U.S.C.A. § 11112(a) were "intended to create an objective standard, rather than a subjective standard [of judicial review], this inquiry may be resolved on summary judgment." Smith v. Ricks, 31 F.3d 1478, 1485 (9th Cir. 1994), cert. denied, 514 U.S. 1035, 115 S. Ct. 1400, 131 L. Ed. 2d 287 (1995).  The question then becomes

A-5112-12T2

whether a plaintiff has been afforded a sufficient opportunity to obtain facts that might bear upon that objective assessment.

The sparse case law under the analogous New Jersey immunity statute is not instructive on the discovery question. As with the federal statute, it is logical to conclude that a defendant's entitlement to immunity under N.J.S.A. 2A:84A-22.10 can at times be resolved on a dispositive motion. It is equally sensible to conclude that a plaintiff's right to discovery on the state-law immunity issues may be reasonably limited by a trial judge.

We decline to adopt a per se rule declaring that a plaintiff physician who has lost his clinical privileges is always entitled to depositions or other full-blown discovery in litigating HCQIA immunity issues. Such a blanket right would conflict with the intent of Congress to permit the HCQIA immunity to be adjudicated at an "early stage of litigation" in appropriate cases. Nor do we construe the New Jersey immunity statute to create such an absolute right.

In some cases, an unfettered right to discovery would needlessly entangle hospitals and review participants in depositions and other litigation activities, thereby diluting the practical benefit of the immunity protection conferred upon them by statute. Although we are mindful that these statutes

provide hospital defendants with immunity from damages rather than immunity from suit, we also appreciate that protracted discovery easily can be costly and burdensome for the persons and entities involved. An appropriate balance can, and should, be struck.

We therefore adopt a case-by-case approach that reposes discretion in the trial court to determine to what extent discovery on the immunity issues should be permitted. See, e.g., R. 4:46-5 (granting trial judges authority to defer decisions on summary judgment motions where the party opposing the summary judgment motion demonstrates, by affidavit, that additional discovery is needed to respond to the motion). Such a case-specific approach is consistent with the important role that our civil trial judges routinely perform in balancing the needs of litigants to obtain relevant information against the often significant burdens and costs of the discovery process. The exercise of wise judicial discretion in striking a proper balance of those interests is particularly important where, as here, immunity statutes are involved.

On appeal, we generally will not second-guess a trial judge's exercise of discretion in discovery matters unless the appellant demonstrates that such discretion was abused. Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 371

48

(2011); <u>Bender v. Adelson</u>, 187 <u>N.J.</u> 411, 428 (2006). We must review the trial court's denial of additional discovery to plaintiff here through that prism of deference.

Here, plaintiff already received at least some amount of paper discovery in the Chancery Division action. Plaintiff and his attorney actively participated in the two hearings before the hospital's hearing panel. He now demands depositions, on the conjectural supposition that such adversarial questioning of the hospital's representatives might reveal a proverbial "smoking gun" reflecting malice or some form of unreasonable conduct on their part.

We concur with Judge Grispin that, given the particular context of this case, there is no need to allow such depositions to proceed when defendants' entitlement to immunity is so clear. Even if depositions proceeded, the individual deponents (or the hospital itself) might assert absolute or qualified privileges from disclosure under potentially-applicable confidentiality laws, and might decline to answer some or all of plaintiff's queries. <u>See, e.g.</u>, <u>C.A. v. Bentolila</u>, 219 <u>N.J.</u> 449, 451 (2014) (involving privileges from disclosure under the New Jersey Patient Safety Act);[21] <u>Christy v. Salem</u>, 366 <u>N.J. Super.</u> 535,

---

[21] Although defendants have cited to the Patient Safety Act, <u>N.J.S.A.</u> 26:2H-12.23 to -12.25, we make no conclusive
                                                        (continued)

541-45 (App. Div. 2004) (recognizing a qualified privilege from disclosure under a hospital's peer review privilege). As the Supreme Court recently underscored in C.A., there are strong public policies recognized by the Legislature in encouraging the free flow of evaluative communications within a hospital made in an effort to improve future patient care. C.A., supra, 219 N.J. at 473. We need not and do not resolve the applicability of these confidentiality laws and public policies, but simply acknowledge that they might well limit the scope of any additional discovery if it had been allowed.

Other than his vague suppositions that his circumstances were unfairly considered by the hospital and its representatives, plaintiff has not set forth a proffer, in a sworn affidavit pursuant to Rule 4:46-5 or otherwise, that specifies what information he would intend to elicit from the hospital's representatives at their depositions. If plaintiff wants to ask them why they did what they did, the reasons are self-evident from the written findings of the Investigating

---

(continued)
determination that the Act applies to the communications in this case. See N.J.A.C. 8:43E-10.9(b)(1) (limiting the protection of the Patient Safety Act to documents, materials, and information developed by a health care facility "exclusively" during the process of self-critical analysis); see also, C.A., supra, 219 N.J. at 467-68. At the very least, the potential applicability of that statute would no doubt complicate the discovery process.

Committee, the hearing panel, and the Board of Trustees — all of which he already has in his possession.

In addition, this is not a case in which antitrust violations have been alleged, which has been true in some of the federal cases where more extensive discovery was permitted. See, e.g., Brader v. Allegheny Gen. Hosp. 64 F.3d 869, 876 (3d Cir. 1995) ("Brader I") (reversing the district court's dismissal of the plaintiff's complaint, in part, because "the adequacy of a physician's contentions regarding the effect on competition is typically resolved after discovery, either on summary judgment or after trial"); see also Sugarbaker, supra, 187 F.3d at 857 (likewise involving discovery completed of a case involving antitrust claims). Where such colorable antitrust claims are present, the factual and legal complexity of the case may be greater and the justification for plenary discovery may be heightened.

Plaintiff's complaint, which he has amended multiple times, makes several conclusory allegations that defendants acted "maliciously" and "arbitrarily" in taking away his clinical privileges. As Judge Grispin correctly recognized, the mere inclusion of such normative adverbs within a physician's complaint does not justify a free-wheeling discovery mission

51

delving into a hospital's internal review and investigation of that physician's poor performance.

The trial court reasonably concluded that plaintiff already had been provided with enough information to attempt to surmount the statutory immunities. Because the court did not abuse its discretion, we sustain its sensible decision to curtail additional discovery and to disallow depositions of the hospital's representatives.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5112-12T2