**TOLEDO, P. & W. R. R. et al. v. PEORIA & P. UNION RY. CO.**

No. 5126.

Circuit Court of Appeals, Seventh Circuit. July 2, 1934.

Rehearing Denied Oct. 2, 1934.

J. M. Elliott, Albert L. Hopkins, Donald J. De Wolfe, and Peter L. Wentz, all of Chicago, Ill., for appellants.

E. E. Horton, of Peoria, Ill., for appellee.

Before ALSCHULER and EVANS, Circuit Judges, and BARNES, District Judge.

EVANS, Circuit Judge.

In a mortgage foreclosure suit brought against Toledo, Peoria & Western Railway Company, et al., the Peoria and Pekin Union Railway Company intervened and sought to establish a claim for moneys due it under a contract which the parties had negotiated on the 1st day of March, 1898. In the foreclosure suit the mortgagor's property was ultimately sold to the co-appellant, George P. McNear, Jr., and his liability was established, if it existed at all, by virtue of an order made at the time he purchased the property and because of a contract which he, at the time, executed.

746

The order provided: " * * * that the Receiver do continue the operation of said railway property * * * for the sole account of said Purchaser, George P. McNear, Jr., in accordance with the terms of the order of June 28, 1926, and that all liabilities of any nature whatsoever which have been incurred by the Receiver as such Receiver or by him in the operation of said property, since midnight June 30, 1926, or which may be hereafter incurred by said Receiver or by him in the operation of said property, a lien be and it is hereby impressed upon all of said railway property now remaining in the possession and under the control of said Receiver, such lien to remain in full force until the further order of this Court."

McNear's contract read: "And the undersigned, as a part of the compromise and settlement authorized by said Order No. 91, hereby assume and agree to pay any and all liabilities of said Receiver growing out of or connected with the operation of said railway property, for which said Receiver or the funds in the hands of the Special Master may be liable under the former orders of said court; and the undersigned do further agree to indemnify and hold harmless the said Receiver and the funds in the hands of said Special Master from any claim against said Receivership filed by the Peoria & Pekin Union Railway Company."

The paragraph out of which this controversy arises is set forth in the margin* and the important clauses are in italics.

The precise question is: Under this contract, were appellants obligated to pay a portion of the taxes assessed against and paid by the terminal company? The District Court answered this question in the affirmative.

Appellants attack the decree and persuasively advance several reasons why this court should reach a contrary conclusion.

The argument, very briefly stated, is as follows: The lessee is not liable to reimburse the lessor for taxes unless the lease clearly so provides. A provision to pay the expenses of maintenance does not include the payment of general property taxes assessed against the property, which are measured by the value of the property. Operation by the receiver did not change the contract nor enlarge the obligations of the lessee. The contemporaneous construction of the parties as evidenced by their action in not paying taxes is a valuable aid in the construction of the word "expenses." Enlarging upon the latter point, appellants argue that taxes were never apportioned to the lessees under this contract up to May 1, 1921. Previous to the contract of 1898 the parties had similar relations, and no taxes were paid by the lessee. The failure to insert a provision respecting the payment of taxes in the new lease is significant, and its significance is emphasized by the fact that there was prepared for the consideration of the parties just prior to the execution of the 1898 contract, an agreement which expressly provided that the lessee should pay taxes and assessments upon the premises. This agreement, however, was not executed, but one without such provision was signed.

The failure to pay the taxes for forty

*"The said lessee shall also pay to the Treasurer of the party of the first part, at the City of Peoria, on the fifteenth day of the succeeding month, or within ten days after a statement thereof shall be furnished by the said first party, its just proportion of the expenses incurred or paid during the preceding month by the party of the first part, for the maintenance, renewal, and keeping in thorough repair and working condition its main tracks and sidings, passenger depot, approaches and facilities, freight and round house or houses, and all other property of the party of the first part used by its lessees, or any of them, in common with the said party of the first part, *and of such other proper joint expenses and charges* as shall accrue from such use of said main tracks, depots, freight and round houses and other property so used, such just proportion to be fixed and determined by the number of wheels used and run by the said lessee on said main tracks, the said amount to be paid by it to bear the same proportion to the whole amount of said expenses so to be incurred which the number of wheels used and run by it on the main tracks of the party of the first part shall bear to the whole number of wheels used and run on such main tracks for the preceding calendar month; *provided, however, that it is expressly understood that the expense of maintenance, renewal and repair of all tracks lying within the yards of the first party at and near Peoria and Pekin, shall be borne and defrayed by the said first party at its own cost.* It is understood that in determining the charge in this paragraph provided for, the method of its apportionment and the tracks to be included in its determination and the extent of the yards above mentioned to be maintained by the party of the first part, shall be the same as is applied to other proprietary lines using the tracks of first party."

years would be most significant were it not for the fact that appellee challenges the fact assertion. It seems the taxes were paid by lessees, but not under the heading "taxes." They were reflected in different expense charges. In 1921 this method was changed. Thereafter, the lessor paid the taxes and on the basis of the amount paid for the previous year billed the lessee monthly and apportioned the same on the wheelage basis.

The fact that two contracts were drawn, one of which specifically provided for payment of lessor's taxes by lessee and the other provided for payment of "expenses incurred * * * for the maintenance, renewal, and keeping in thorough repair and working condition," etc., and "of such other proper joint expenses and charges" is not particularly significant. The parties may not have been at variance over taxes, but other provisions of the contract were more controversial. At any rate the real question is: What did the parties agree to do by the agreement they signed?

In approaching the solution of this question, we are naturally curious to know the subject matter of the agreement. What were the parties trying to cover by their agreement? It is apparent that the so-called terminal railroad was leasing its tracks, depot, and other facilities to certain railroads that ran into Peoria and thus providing union terminal facilities for all. The rental was determined on the somewhat uncertain but nevertheless equitable basis of apportioning expenses among lessees on the wheelage basis. In other words, lessee would pay such proportion of total expenses as its use bore to the total use, and such usage was measured by the number of wheels under cars that moved on, and over the terminal tracks.

Appellants' argument would be much stronger if the lessee had not affirmatively obligated itself to pay for two services. It agreed to pay "its just proportion of the expenses incurred or paid during the preceding month by the party of the first part, for the maintenance, renewal, and keeping in thorough repair and working condition its main tracks and sidings, passenger depot, approaches and facilities, freight and round house or houses," etc.

It then also provided that it would pay "such other proper joint expenses and charges as shall accrue from such use of said main tracks, depots, freight and round houses," etc.

It is difficult to understand how this language covered anything more definitely or precisely than taxes and insurance. What else could have been included under this second payment clause?

The evidence also shows that the Interstate Commerce Commission used the words "expenses and charge of operation" to include state, county, school, city, and municipal taxes. If the word had a well-defined meaning in the field of railroad accounting, that meaning should be given to it by the courts when contracts are being construed.

It is argued that the decree cannot stand because the court did not make findings of fact as provided by Rule 70½ (28 USCA § 723). This should have been done by the court or the master. If performed by the master the court should either correct, reject, or adopt such findings as its own. In the case before us the court decreed: "That the exceptions filed herein on behalf of Toledo, Peoria and Western Railroad, Toledo, Peoria and Western Railway Company and Samuel M. Russell, former Receiver of Toledo, Peoria and Western Railway Company, be and the same are hereby overruled and the report of said Special Master is hereby approved * * *."

While the ruling upon the exceptions to the master's report is not a proper part of the decree of a court of equity, we are not prepared to ignore the ruling solely because of the place where it appears.

The trouble in this case is that the master did not make satisfactory findings. He divided his report into five heads: a statement of the case; findings as to law in the case; payment under protest; construction by the parties; and conclusions. Under his conclusions he said: " * * * I find the issues with the Peoria and Pekin Union Railway Company, the Intervener herein * * *."

We are not as much interested in the names given to the subdivisions of the report by the master as to the contents thereof. We can ignore the names. The purpose of a reference, if it be to take testimony and make findings of fact and conclusions of law, is met only by the master's careful preparation of findings on all material issues. The findings are far more important than the conclusions.

It does not follow, however, that because no findings were made either by the court or master that we must reverse the decree. The controverted question is a very narrow one. Disputed issues of fact are not numerous. Such disputes as exist are not serious but largely limited to inferences deducible

from facts. We are convinced that the proper construction of the contract calls for a decree in appellee's favor.

■ The court allowed interest at 5%. The contract was in writing. The interest actually allowed ran from a date short of the actual default.

It seems clear that this was a case for the allowance of interest. Section 2, c. 74, Smith-Hurd Revised Ill. Stats. 1933; Heissler v. Stose, 131 Ill. 393, 23 N. E. 347; Concord Apt. House Co. v. O'Brien, 228 Ill. 360, 81 N. E. 1038; Hood v. High School Dist., 223 Ill. App. 451.

■ It is finally urged that the decree should not have been against appellant McNear because he was not a party to the litigation. When he purchased the property and obtained the order directing the receiver to conduct it for him and as his agent until he paid the purchase price and when he gave to the court an indemnity agreement protecting the receiver against liability for these unpaid taxes, he became a party to the proceedings and subject to the entry of a decree on the pending claim of the intervener.

The decree is affirmed.