**SIANO v. HELVERING, Com'r of Internal Revenue, et al.**

District Court, D. New Jersey.
Feb. 11, 1936.

See, also, 79 F.(2d) 444.

George Sommer, of Newark, N. J. (Frederic M. P. Pearse, of Newark, N. J., of counsel), for complainant.

Harlan Besson, U. S. Atty., of Trenton, N. J., and Samuel Cohen, of Newark, N. J.,

Technical Adviser to District Supervisor, for defendants.

CLARK, District Judge.

This case has been remanded to us because of our failure to comply with Equity Rule 70½, 28 U.S.C.A. following section 723. This rule was promulgated by the Supreme Court on June 2, 1930 (adopted as of October 1, 1930). It derived from the action, or rather inaction, of the District Court for the Northern District of California. A passenger sued the Panama Mail Steamship Company in admiralty for the damage ensuing upon a criminal assault by one of the lines stewards. The defense was the usual one—"volition not coercion"—and was buttressed with the usual combination—"no outcry and no complaint." The learned District Judge entered a decree for the libelant and, so to speak, let it go at that. The Court of Appeals for the Ninth Circuit seemed perfectly satisfied with both the substance and the manner of this decision and affirmed "without," as they said, reviewing "the details of the testimony, from which no good can result." They felt "that this case belongs to that class where appellate courts refuse to review decisions of trial courts based on conflicting testimony taken before them, unless the record discloses some plain error of fact." Panama Mail S.S. Co. v. Vargas (C.C.A.) 33 F.(2d) 894 at pages 894, 895.

The United States Supreme Court upon certiorari (Panama Mail S.S. Co. v. Vargas, 281 U.S. 670, 50 S.Ct. 448, 74 L.Ed. 1105) found fault with these proceedings in the courts below, vacated the decrees and remanded the case. They said, 281 U.S. 670, at pages 671 and 672, 50 S.Ct. 448, 74 L.Ed. 1105:

"Thus we have a case in which the evidence is conflicting—pronouncedly so according to the argument in this court—and in which there has been no distinct findings of the facts by the court primarily charged with their determination. No doubt a finding of some kind is to be implied from the decree—a finding that would suffice as against a collateral attack. But the present attack is direct, not collateral. It is made in an appellate proceeding where the review, unlike that on a writ of error at law, extends to the findings of fact as well as to the rulings on questions of law. The decree does not show on what premise of fact or law it was given, but only that it was given on some premise which in the court's opinion entitled the plaintiff to the decree. The court may have regarded the evidence as showing seduction rather than rape, and may have given the decree on the theory that the defendant was equally liable in either case. In the absence of distinct findings, an appellate court cannot know how the questions of fact were resolved. * *

"Formerly it was the general practice in suits in admiralty to make distinct findings on the issues of fact; and, while that practice placed an added duty on trial judges, it was attended with undoubted advantages, in that it made for greater precision in the disposal of such suits in the trial courts and facilitated the presentation and consideration of appeals from decrees therein."

That distinguished court had previously registered a similar complaint in a case where a three-judge or statutory court had enjoined the Interstate Commerce Commission. Virginian R. Co. v. United States et al., 272 U.S. 658, 47 S.Ct. 222, 71 L.Ed. 463. Mr. Justice Brandeis speaking for the court, 272 U.S. 658, at page 675, 47 S.Ct. 222, 229, 71 L.Ed. 463, said: "Unless an opinion indicating the grounds of the decision is delivered, a defeated party may often be unable to determine whether the case presents a question worthy of consideration by the appellate court. This is particularly true, where the case is in equity and the decree is entered upon a hearing involving complicated facts. For, being in equity, matters of fact as well as of law are reviewable; and the reviewable issues of law are rarely sharply defined by requests for rulings. The failure to accompany the decree by an opinion may thus deprive litigants of the means of exercising a sound judgment on the propriety of an appeal. And the appellate court, being without knowledge of the grounds of the decision below, is denied an important aid in the consideration of the case, and will ordinarily be subjected to much unnecessary labor." The Vargas Case was decided June 2, 1930. Mr. Justice Butler, in his dissent in the case of Los Angeles Gas & Electric Corporation v. Railroad Commission, 289 U.S. 287, at page 327, 53 S.Ct. 637, 652, 77 L.Ed. 1180, after citing cases wherein specially constituted district courts had ignored the Supreme Court's "emphatic reminders" to make definite findings or to give reasons upon which they grounded their decrees, added, "Finally, June 2, 1930, we promulgated the rule, 281 U.S. 773." The identity of dates

seems less a coincidence than an indication of the "last straw."

■ In any event, the rule as adopted has itself been fruitful of litigation. A cursory examination of the digest reveals fifteen reported cases in which it is discussed. Unfortunately there has been no case of interpretation by its draftsman, the high court. We find the Circuit Court of Appeals for the Sixth Circuit commenting on this unavoidable absence of helpful definition (Briggs v. United States, 45 F.(2d) 479) and saying: "Lacking any exposition of that rule by the Supreme Court, we do not understand that it contemplates, in the ordinary equity case, all the proceedings and formalities which attend such findings in suits at law. Until it is otherwise authoritatively held, we shall think the rule satisfied by a clear and concise statement by the trial judge—whether called findings or opinion—which shows what he regards as the essential facts and the applicable rules of law." There has, however, been an interpretation by way of amendment. On November 25, 1935, the Supreme Court added the clause, "and in granting or refusing interlocutory injunctions." By well-known rules of statutory construction, this addition indicates a previous exclusion. That the term "suits in equity" did not include such matters was the opinion universally held by district courts. The principal case happens to fall within that class (brief of counsel for complainant-appellant, p. 1). Furthermore, it has been considered the duty of counsel to present requests for such findings of fact and conclusions of law. St. Paul Fire & Marine Ins. Co. of St. Paul, Minn. v. Tire Clearing House (C. C.A.) 58 F.(2d) 610 at page 613. No such procedure was followed in this case, and in fact it was our understanding that counsel wished to carry the case to the Court of Appeals with a speed too great to allow for the formulation and submission of such findings and conclusions.

There is another less technical reason why we did not think the rule applicable. The complaint was to correct the action of the acting supervisor of permits, of the Alcohol Tax Unit, for the Fourth District. The Acting Supervisor designated an attorney to "act in his place" in conducting a hearing on the revocation of the permit (Exhibit A). This hearing was held, both the government and the permittee were represented by counsel and 167 pages of testimony were taken. The hearer filed thorough findings of fact and conclusions of law (Revocation Proceedings, p. 168). We read the testimony and listened to the arguments of counsel. After doing so, we concluded that the hearer's findings and conclusions were sound and expressly adopted them (May 10, 1935). In these circumstances, we did not understand in what way we could be of any further assistance. At best, our task would have been then and is now only one of dialectics. We are supported in our understanding by the judgment of the only Circuit Court of Appeals which has directly considered the matter. In the case of Toledo, P. & W. R. R. et al. v. Peoria & P. Union Ry. Co. (C.C.A.) 72 F.(2d) 745, at pages 747, 748, the court said:

"It is argued that the decree cannot stand because the court did not make findings of fact as provided by Rule 70½ (28 U.S.C.A. following section 723). This should have been done by the court or the master. If performed by the master the court should either correct, reject, or adopt such findings as its own. * * *

"The purpose of a reference, if it be to take testimony and make findings of fact and conclusions of law, is met only by the master's careful preparation of findings on all material issues. The findings are far more important than the conclusions.

"It does not follow, however, that because no findings were made either by the court or master that we must reverse the decree. The controverted question is a very narrow one. Disputed issues of fact are not numerous. Such disputes as exist are not serious but largely limited to inferences deducible from facts. We are convinced that the proper construction of the contract calls for a decree in appellee's favor."

We said our task at best is one of dialectics. There seems to us, however, to be an "at worst." The Courts of Appeal have emphasized a ratio decidendi for the rule. It is the familiar principle that the trier of the facts has the opportunity to see and hear the witnesses. So we find the Court of Appeals for the Ninth Circuit in their affirmance of the District Court (by coincidence the same judge who figured in the Vargas Case) saying in the case of Parker v. St. Sure, 53 F.(2d) 706 at page 708: "It is obvious that, where the judgment of the trial judge, in determining the controverted issue of fact, is given great weight upon the appeal, in case of conflicting evidence by witnesses who testify in the

presence of the judge, the appellate court in exercising its jurisdiction in equity and admiralty cases should be advised of the conclusion of the trial court as to where the truth lies as between witnesses who contradict each other." And see, also, the case of National Reserve Ins. Co. of Illinois v. Scudder (C.C.A.) 71 F.(2d) 884. In the case at bar we are being asked, therefore, to do something which is contrary to the logic which should prompt the request. Ex necessitate we have not had an opportunity to see or hear the witnesses who appeared before the hearer. We may say also that unless rule 70½ is interpreted in the sense indicated, the Courts of Appeal are going to have to indulge in some very complicated and subtle distinctions about "ultimate facts." Botany Worsted Mills v. United States, 278 U.S. 282, at page 291, 49 S.Ct. 129, 73 L.Ed. 379; Parker v. St. Sure (C.C.A.) 53 F.(2d) 706, at page 708; Edwards v. Holland Banking Co. (C.C.A.) 75 F.(2d) 713, at page 715; United States v. McIntosh (D.C.) 3 F.Supp. 715; John Freeman v. United States (C.C.A.3) 81 F.(2d) 910, filed January 30, 1936. The difficulties issuing from this unprofitable pursuit are well illustrated in a learned article by late great Professor Thayer in 4 Harvard Law Review, p. 147.

We have indulged in this amount of "reasoning why" for no purpose of self-justification, but because we should be glad to be advised of our future duty. We feel like echoing the sentiments of Judge Faris of the District of Missouri in the case of Carter v. United States (D.C.) 3 F.Supp. 782 and like him would gladly be spared additional labor. At page 785 of 3 F.Supp. the court said: "Notwithstanding this, there is a request in the record that this court make and file a special finding of facts and conclusions of law. To a court well-nigh submerged with litigation, neither time exists for, nor the law requires, compliance with this request." If, however, our controlling court requires it, we shall be only too pleased to obey to the best of our ability. We now proceed to do so in the case at bar.

The recommendation of the hearer and the action of the supervisor were based on two grounds. Either one of them was sufficient and neither one of them involved any conflict of testimony. The hearer found, first, that the permittee had not paid an excise tax; and, second, that the permittee had violated the express and plain terms of his withdrawal permit. The excise tax was imposed by section 603 of the Revenue Act of 1932 (47 Stat. at Large, pp. 169, 261, 26 U.S.C.A. c. 20, p. 428, following section 1481), and affected transactions beginning in 1932 and later.

The tax is in form a manufacturers' sales tax (10 per cent.) imposed on various more or less luxuries, furs, jewels, etc., and the particular section is headed "Tax on Toilet Preparations." It has been continued by each succeeding Congress (48 Stat. at Large, 206, § 212; 49 Stat. at Large, 431 c. 333). The revenue service of the Treasury Department in 1933 issued an elaborate form for the return of the tax (Treasury form 728, revised May, 1934). The complainant herein made no return in any of the years preceding the present litigation and has, in fact, never made any such return. The tax has, however, been quite recently and unpleasantly called to his attention by the Internal Revenue Department. Their agents visited his plant on January 14, 1935, examined his sales records and found that he owed the United States, $6,665.13 in taxes and penalties.

 That the so-called permittees are governed by the regulations promulgated by the Commissioner of Internal Revenue seems hardly to require argument. It is implicit in the governmental policy which has been applied to industrial alcohol since the turn of the century. That policy recognized that the taxation of alcohol had always had something of a sumptuary character (58 Congressional Record, pp. 2293, 4838; Thorpe on Prohibition and Industrial Alcohol, p. 689). It authorized the tax-free withdrawal "for use in the arts and industries" of alcohol on condition that its use otherwise was made impossible (or should we say improbable) by mixing with "methyl (wood) alcohol or other denaturing material." As an inevitable concomitant, the Revenue Bureau had to insure against reconversion after withdrawal. Hence the permit and regulation system. Helvering v. Druggists' Specialties Co. (C.C.A.) 76 F. (2d) 743, 745. The regulations bore the numbers 30, 61, and, finally, 3. Section 503 of the latter reads as follows: "Or failure in good faith to observe and comply with the requirements of all Internal Revenue and other laws relating to any operations under his permit." Obviously the sale of various toilet preparations manufactured with the denatured alcohol (formula 40)

withdrawable only because the permit there "relates" to an operation thereunder. The manufacture of the preparation is only possible by the use of the withdrawn and tax-free industrial alcohol, and is certainly, therefore, an operation under the permit. The tax is imposed upon the sale of the finished product. The word "relate" by the dictionary means to bring into association or connection with and is synonymous with the more extensively used "refer" (the New Century Dictionary, pages 1501 and 1512). The tax is on the last and inevitable step, therefore, of a process which began with the withdrawal. It has accordingly a "connection" or "association" with that operation. Furthermore, to give the word "relate" another meaning renders it without meaning. From the nature of the industrial alcohol policy earlier discussed, the tax and so the reference to Internal Revenue law becomes relevant only after manufacture. That being so, this phase of the case turns upon the interpretation of the expression "good faith" used in the regulation.

As is known, these two words or their Latin equivalent appear frequently in the law. They are capable of and have received at least two divergent meanings. What one might call the broad or subjective view defines them as describing an actual state of mind irrespective of its producing causes. An extreme example of this point of view is found in the case of State v. West Branch Lumber Co., 64 W. Va. 673, 63 S.E. 372, 380, where the court said: "Good faith, in the law relating to reimbursement for improvements put upon land not belonging to the person in possession, * * * is * * * used * * * in its popular sense as the actual, existing state of the mind, whether so from ignorance, skepticism, sophistry, delusion, fanaticism, or imbecility, and without regard to what it should be from given legal standards of law or reason." And see, also, Dallas Waste Mills v. Texas Cake & Linter Co. (Tex.Civ.App.) 204 S.W. 868, 869; New York, N. H. & H. R. Co. v. First National Bank of Bridgeport, 105 Conn. 33, 134 A. 223, 226; Stufflebeam v. De Lashmutt (C. C.) 101 F. 367, 370. On the other hand, many courts have construed the words narrowly and objectively and have introduced criteria. We quote from three pertinent cases:

"A want of that caution and diligence which an honest man of ordinary prudence is accustomed to exercise in making purchases is, in judgment of law, a want of good faith." Pringle v. Phillips, 7 N.Y. Super.Ct. 157, 165.

"To constitute good faith, there must not only be an absence, not alone of participation in the fraud or collusion with the vendee, but also of knowledge, or even notice of the fraud, or of facts and circumstances calculated to put an ordinarily prudent business man on inquiry, so that he would ascertain the truth." Thus, where it appeared that a purchaser of stock had suspicions relating to the sale of it, he cannot be said to be a purchaser in good faith. Pinkerton Bros. Co. v. Bromley, 119 Mich. 8, 77 N.W. 307, 308.

"Good faith is defined to be honesty of intention, and freedom from knowledge of circumstances which ought to put the holder upon inquiry." Cochran v. Fox Chase Bank, 209 Pa. 34, 58 A. 117, 118, 103 Am.St.Rep. 976.

And see, also, Allen v. Pioneer Press Co., 40 Minn. 117, 41 N.W. 936, 939, 3 L.R. A. 532, 12 Am.St.Rep. 707; Whitney v. Huntington, 37 Minn. 197, 33 N.W. 561, 563; Jennings v. Lentz, 50 Or. 483, 93 P. 327, 329, 29 L.R.A.(N.S.) 584; Gray v. Times Newspaper Co., 74 Minn. 452, 77 N. W. 204, 206, 73 Am.St.Rep. 363; Dartmouth College Trustees v. International Paper Co. (C.C.) 132 F. 92, 98.

This tendency to whittle down the popular-sense meaning of the words undoubtedly arises from difficulties of proof. To indicate what a state of mind should be is one thing. That depends on extrinsic factors. To show what it actually is, is quite another. The principal case well illustrates the point we are trying to make.

The unpaid tax became due in July, 1932, and compliance therewith required a monthly return (form 728) for all the months since then. During all of those thirty-one months, the permittee was in the business of manufacturing toilet preparations. The imposition of taxes is widely published in the newspapers, the trade journals, and is, in fact, generally a matter of quite unpleasant notoriety. Nevertheless, Siano emphatically asserted that he had never heard of the tax. No one was, or probably could be, produced who had told him of it. As a matter of fact, for a long time it did not occur to the Commissioner of Internal Revenue to inquire of the Bu-

reau of Industrial Alcohol who had permits to withdraw alcohol for the manufacture of toilet preparations. When it did occur to them (circular letter of August 7, 1934), the local office of Internal Revenue made no effort to act upon the information —a typical example of co-operation among government bureaus.

On the state of mind theory of good faith, therefore, the permittee of the principal case does not, in our opinion, come within the regulation. We have not time here to discuss the implications of the maxim ignorantia legis neminem excusat. It may excuse even certain cases of mala prohibita, and it certainly qualifies express language, whether contained in a statute or a regulation.

We cannot, however, apply the state of mind theory to the administrative regulation of a government bureau. To do so would be, in our judgment, to render it nugatory. This because its enforcement would, in nine cases out of ten, be possible of sterilization by the testimony of the party most interested in evading it. How does the case stand in the diligence or reasonable inquiry interpretation of the words? We think badly for the complainant. The government could and perhaps for the completeness of the record should have introduced evidence of the fame (or notoriety, as we said before) of the tax. Even in the absence of such evidence, we think the permittee was under a duty to make inquiry. We place that upon two factors: The nature of taxes, and the lapse of time. Three years and a tax universal to his trade call, in our opinion, for some curiosity. No attempt to satisfy that curiosity smacks to us too much of the ostrich and proportionately too little of good faith.

■ The second ground for revocation is even stronger, in fact so strong that it requires very little elaboration. In line with the policy under which industrial alcohol was made tax exempt, the withdrawal privilege had to be guarded from abuse. Obviously withdrawals of the particular withdrawant (if there is such a word) might tempt to conversion. To prevent any yielding on the part of Siano, he was limited by the express terms of his permit. That limitation reads as follows: "Those two preparations not to exceed more than 15 gallons to a customer a month."

There is absolutely no reference to gallon units in the permit. The permittee concedes that he has on numerous occasions sold more than the presented fifteen gallons to one customer in one month. He gives the most curious excuse for this action. It is that the fifteen-gallon limit applies only to sale in one-gallon jugs and permits the sale of any quantity, no matter how great, if the sale is made in smaller portions. The basis for this peculiar assertion seems to be that in the original formula sheet (October 11, 1933) Siano volunteered the statement that sales would be made in eight-ounce bottles. Even if the permittee could impose a condition on the government, the reference to the bottles is couched in no such form. Even if it had been, it was rejected. By paragraph 2 of a letter of October 20, 1933, one Rhees, Assistant Commissioner of Industrial Alcohol, restricted the permittee to fifteen gallons, as above indicated. This condition was indorsed on the first formula sheet signed by Siano before its approval by the Department on November 9, 1933. To reduce the permittee's argument to its lowest terms, one might say that if the bottles had been one ounce, the amount withdrawable would be raised in arithmetical or even geometrical progression.

■ The complainant contends further, that, assuming facts justify revocation, it was done under an exhausted power. The controlling statute (National Prohibition Act, tit. 2, § 9, 27 U.S.C.A. § 21) requires a citation by the Commissioner following "immediately" upon a "reason to believe." Courts have found this provision mandatory and a failure to comply, therefore, the exercise of a no longer existing power. Walter v. Pennington (D.C.) 25 F.(2d) 904. The citation in the principal case followed by one month the only investigation of the permittee's actual records. The excessive sales could and did appear only from these records. They could not and did not come to the notice of the inspector who made casual stops at the premises on his way to and from work. That inspector did not have accordingly the "reason to believe" of the statute. It is unnecessary to consider, therefore, whether the "reason to believe" of a field inspector would estop, so to speak, the Commissioner (now supervisor) in the absence of a report by him to his superiors. Any such doctrine would seriously hamper the collection of the revenue. The reasoning of the cases seems

otherwise. Pennington v. Walter (C.C.A.) 29 F.(2d) 912; Cucuzza v. Campbell (C.C.A.) 37 F.(2d) 31; Frank J. Smith & Son v. McCampbell (D.C.) 52 F.(2d) 878; Meinwald v. Doran (D.C.) 60 F.(2d) 261.