**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0244-13T2

CHRISTINE GASPERETTI, M.D.,

    Plaintiff-Appellant,

v.

DEBORAH HEART AND LUNG CENTER,
LYNN MCGRATH, M.D., JOHN ERNST
and JILL T. OJSERKIS, ESQ.,

    Defendants-Respondents,

and

STATE OF NEW JERSEY, BOARD OF
MEDICAL EXAMINERS,[1]

    Defendant.

_____

> Argued November 2, 2016 — Decided November 22, 2017
>
> Before Judges Fuentes, Carroll and Gooden Brown.
>
> On appeal from the Superior Court of New Jersey, Chancery Division, Mercer County, Docket No. C-000144-08.
>
> Michael Confusione argued the cause for appellant Christine Gasperetti, M.D., (Hegge

---

[1]  The claims against the State of New Jersey, Board of Medical Examiners, were settled prior to oral argument.

& Confusione, LLC, attorneys; Mr. Confusione, of counsel and on the briefs).

William M. Honan argued the cause for respondents Deborah Heart and Lung Center, Lynn McGrath, M.D., and John Ernst (Fox Rothschild, LLP, attorneys; Mr. Honan, of counsel; Mary M. McCudden, on the brief).

Robert A. Baxter argued the cause for respondent Jill T. Ojserkis, Esq. (Craig, Annin & Baxter, LLP, attorneys; Mr. Baxter, of counsel and on the brief).

The opinion of the court was delivered by

GOODEN BROWN, J.A.D.

Plaintiff Christine Gasperetti, M.D., appeals from the Chancery Division's June 3 and August 15, 2013 orders. The June 3, 2013 order granted summary judgment to defendants Deborah Heart and Lung Center (Deborah), Lynn McGrath, M.D., and John Ernst. The August 15, 2013 order denied plaintiff's motion for reconsideration.[2] Having considered the arguments and applicable law, we affirm.

---

[2] In an April 30, 2010 order, the trial court dismissed the complaint against defendant Jill Ojserkis for failure to state a claim upon which relief can be granted, R. 4:6-2(e). Plaintiff did not identify the April 30, 2010 order in either her Notice of Appeal or her Amended Notice of Appeal. It is well-settled that we review "only the judgment or orders designated in the notice of appeal[.]" 1266 Apartment Corp. v. New Horizon Deli, Inc., 368 N.J. Super. 456, 459 (App. Div. 2004) (citing Sikes v. Twp. of Rockaway, 269 N.J. Super. 463, 465-66 (App. Div.), aff'd o.b., 138 N.J. 41 (1994)). See also R. 2:5-1(f)(3)(A). Stated differently, any arguments raised by defendant that fall outside the four

We derive the following facts from evidence submitted by the parties in support of, and in opposition to, the summary judgment motion, viewed in the light most favorable to plaintiff. Angland v. Mountain Creek Resort, Inc., 213 N.J. 573, 577 (2013) (citing Brill v. Guardian Life Ins. Co., 142 N.J. 520, 523 (1995)). Plaintiff is a board certified interventional cardiologist. She was employed by Deborah from 1998 until her resignation on June 17, 2008. Plaintiff alleged that beginning in 2005, she was subjected to a hostile work environment and bullying by other physicians in the Cardiac Catheterization Lab (Cath Lab) based on her gender. Plaintiff complained about inappropriate gender-based postings on the Cath Lab bulletin board and other harassing incidents. In response, administrative action was taken, including reiterating to all Cath Lab employees Deborah's policy regarding sexual harassment; requiring department managers to review and approve the content of all postings on a daily basis; and advising that further instances would lead to disciplinary action.

---

corners of the Notice of Appeal likewise fall outside the scope of our appellate jurisdiction in this case, and are therefore not reviewable as a matter of law.

On October 8, 2007, Dr. Tommy Ng and Dr. Charles DeBerardinis, two of plaintiff's colleagues with whom she had serious disagreements about scheduling, billing and patient referrals, told Bret Bissey, Deborah's Corporate Compliance Officer, that they were troubled about the clinical care plaintiff was providing to her patients. The doctors indicated that they had reviewed three cases in the past week in which they believed that medically unnecessary catheterizations may have been performed by plaintiff. At the time, DeBerardinis was the Director of the Cath Lab and Ng was the Assistant Director. Although Bissey requested that the doctors put their concerns in writing, they failed to do so. Nonetheless, Bissey recommended to John Ernst, Deborah's President and Chief Executive Officer, that they "hire an external evaluator . . . to assist [Deborah] in determining and assessing whether this claim of medically unnecessary angioplasties being performed by [plaintiff] [was] valid."

When Bissey left Deborah's employ, Michael McKeever took over as Director of Corporate Compliance and followed up with Ernst regarding DeBerardinis' and Ng's complaint. As a result, on January 25, 2008, Ernst asked DeBerardinis and Ng to identify ten of plaintiff's cases. He informed them that he and Dr. Lynn McGrath, Deborah's Vice President of Medical Affairs, would empanel a Professional Practice Evaluation Committee (PPEC) to

A-0244-13T2

initiate an independent review of the identified cases to ascertain the validity of the concerns and take appropriate corrective action. At the time, Deborah was negotiating an employment contract with plaintiff and considering her for other leadership positions. However, Ernst was assured by McGrath that an employment contract could be vacated if the allegations were substantiated.

On February 28, 2008, Deborah held its first PPEC meeting. After acknowledging that the Cath Lab was polarized and that plaintiff had previously complained about harassment, the PPEC directed its outside counsel, Jill Ojserkis, to initiate an external review of the ten identified cases to avoid further "internal dissension and breach of confidentiality." On April 10, 2008, Deborah engaged Medical Peer Review Services, LLC (Medical Peer Review), to review the ten cases identified by DeBerardinis and Ng as well as ten additional randomly selected cases. On June 5, 2008, Medical Peer Review submitted its reports to Ojserkis, finding numerous issues related to the standard of care undertaken by plaintiff. Mahdi Al-Bassam, M.D., prepared the executive summaries and peer review reports submitted by Medical Peer Review for all twenty cases. On June 12, 2008, McGrath recommended the PPEC reconvene to analyze the report.

On the morning of June 17, 2008, plaintiff delivered a letter of resignation to Ernst, indicating it would be effective June 30, 2008. Plaintiff had sought alternative employment, in part, to secure a more stable schedule to spend more time with her ailing mother, and had confidentially accepted an offer of employment from the University of Pennsylvania Health System (Penn). Later that afternoon, the PPEC reconvened at 1:00 p.m. to discuss Medical Peer Review's findings. The PPEC "noted that there may be issues with [plaintiff's] interpretation skills in addition to possible quality of care issues." However, because the members "had not had adequate time to review the findings prior to the meeting[,]" they decided "to do a more detailed review of the findings in order that they can be discussed in greater detail at the next meeting." The PPEC expressed concern about plaintiff "treat[ing] patients alone" in the interim. Upon being informed that "[plaintiff] was on a [two-] week vacation and had sent in a letter of resignation effective June 30th[,]" the PPEC directed Dr. Gallagher, Acting Vice President of Medical Affairs in McGrath's absence, to notify plaintiff that "a review was ongoing" and if she chose to treat patients upon her return, she would be subject to monitoring.

Following the meeting, Gallagher telephoned plaintiff and advised her that there were "problems" with her work. Plaintiff

A-0244-13T2

discontinued the call. After the phone call, plaintiff e-mailed a revised resignation letter to Ernst, making her resignation effective "immediately" due to "unforeseen personal circumstances[.]" On June 26, 2008, the PPEC reconvened to discuss its review of Medical Peer Review's findings. While there were a few cases in which Committee members did not agree with Medical Peer Review's findings, the PPEC "agreed that the report clearly showed potentially significant issues with clinical skills and judgment that could affect patient care." However, upon being advised that plaintiff had resigned, the PPEC terminated its review and referred its findings to administration for reporting as necessary.

On July 24, 2008, pursuant to N.J.S.A. 26:2H-12.2b(a)(3),[3] Ojserkis, in her capacity as counsel to Deborah, submitted a

---

[3] N.J.S.A. 26:2H-12.2b(a)(3) provides:

> A health care entity shall notify the Division in writing if a health care professional who is employed by . . . that health care entity . . . voluntarily resigns from the staff if . . . the health care entity is reviewing the health care professional's patient care or reviewing whether, based upon its reasonable belief, the health care professional's conduct demonstrates an impairment or incompetence or is unprofessional, which incompetence or unprofessional conduct relates adversely to patient care or safety[.]

notification, to the New Jersey Board of Medical Examiners (Board) informing the Board that plaintiff resigned her position while "Deborah was reviewing [her] patient care." In the notification, Ojserkis stated:

> Deborah's [PPEC] began a focused practice evaluation regarding certain clinical practices including documentation issues of [plaintiff] which resulted in Deborah sending certain medical records to an outside peer reviewer. The outside peer reviewer reports were reviewed by [PPEC] at its meetings on June 17, 2008 and June 26, 2008. The Committee agreed with the outside peer reviewer that the report showed potentially significant issues with clinical skills and judgment that could affect patient care.

> At [PPEC's] request, a member of [PPEC] contacted [plaintiff] on June 17, 2008 to advise her that [PPEC] wanted to meet with her to discuss areas of concern. It appears that [plaintiff] verbally resigned on June 17, 2008 although she provided a written letter of resignation dated June 16, 2008 making her resignation effective June 30, 2008. [Plaintiff] then sent another letter dated June 17, 2008 changing the date of her resignation to immediate. It is unclear whether [plaintiff's] first resignation occurred before or outside the call with a member of [PPEC].

Ojserkis indicated in the notification that Deborah did not provide plaintiff "with a copy of [the] notice as required under N.J.S.A.

26:2H-12.2b(h)[,][4] as the report [was] made pursuant to section (a)(3) which appears to be an exception to the notice provision."

In addition, on August 4, 2008, McKeever prepared the following memo to plaintiff's credentials file:

> On July 24, 2008, [Deborah's counsel] notified the [Board], pursuant to N.J.S.A. 2H:12.2b, that [plaintiff] at the time of her voluntary resignation from the Medical Staff of Deborah was the subject of a [PPEC] that was formed to review certain of her clinical practices including documentation issues. Prior to her resignation, and unknown to her at the time, certain records had been independently peer reviewed. [Plaintiff] resigned upon being made aware of the review by the [PPEC] but before the [PPEC] met to accept the results.

As part of her new position at Penn, plaintiff sought credentials at other hospitals. In response to credentials requests from these institutions, where applicable, Deborah supplied the McKeever memo. Plaintiff's application for credentials was never turned down by any hospital.

---

[4] N.J.S.A. 26:2H-12.2b(h) provides, in pertinent part,

> [a] health care entity shall provide the health care professional who is the subject of a notice pursuant to paragraphs (1), (2), (4) and (5) of subsection a. of this section . . . with a copy of the notice provided to the division when the health care entity submits the notice to the [Division of Consumer Affairs in the Department of Law and Public Safety].

Additionally, in response to a request from Virtua Medical System for further credentialing information, McGrath advised that: 1) "a complaint had been raised against [plaintiff] . . . regarding certain practice patterns[;]" 2) an "external peer reviewer" was engaged and issued "a report indicating that there were certain irregularities in [plaintiff's] practice, including the performance of unnecessary right heart catheterizations[;]" 3) plaintiff was informed "that she was under investigation because of issues related to her practice[,]" and "[s]hortly thereafter, . . . resigned[,] . . . voiding any protections that would have ordinarily been afforded to her by the medical staff bylaws" and without "the opportunity to present her side of the case[;]" and 4) on the advice of counsel, "a report was made to the [Board.]"

On August 13, 2008, the Director of the Division of Consumer Affairs notified plaintiff that a "change" to the Privilege Loss/Restriction section of her New Jersey Health Care Profile was going to be made public in thirty days. Plaintiff certified that she first became aware of the report to the Board on August 16, 2008, when she received the August 13, 2008 notice. The notice advised plaintiff that "[t]he New Jersey Health Care Consumer Information Act, as amended, require[d] that profile information . . . be made available to the public." However, under "[t]he law[,]" plaintiff had "[thirty] calendar days to review and correct

10

any factual inaccuracy to the modified profile before it becomes available to the public."

Plaintiff formally objected to the modification of her public profile but, on October 17, 2008, the Board determined that the modification was warranted. The Board agreed, however, to stay the modified posting for thirty days to allow plaintiff to obtain a retraction from Deborah or contest the ruling in court. Otherwise, the Board intended to post the following statement on plaintiff's physician profile: "Deborah . . . reported that [plaintiff] resigned while Deborah was conducting a review of her clinical practices (including documentation issues)." The Board's decision was based on Ojserkis' July 24, 2008 notification as well as Ojserkis' subsequent letter to plaintiff dated August 29, 2008, in which Ojserkis stated "that [plaintiff] was 'made aware prior to her resignation' that Deborah's PPEC began a focused review of certain of [her] clinical practices including documentation issues."

The Board explained:

> Given that factual predicate . . . , the Board takes the position that it clearly has a statutory obligation to post a description on [plaintiff's] physician profile regarding the resignation. See N.J.S.A. 45:9—22.23(a)(8). Alternatively stated, the Board maintains that a resignation of staff privileges that occurs during the pendency of an investigation related to a physician's clinical practice,

11

> where the physician is aware of the
> investigation prior to submitting her
> resignation, is a resignation "for reasons
> related to the practitioner's competence" and
> is thus required to be posted on the physician
> profile. Id.
>
> While the Board is certainly cognizant
> of [plaintiff's] claim that she resigned for
> personal reasons that had nothing to do with
> any investigation of her practice, and her
> further claim that she only learned of the
> investigation of her practice after she had a
> meeting with the hospital's CEO, [plaintiff's]
> claim is directly at odds with the position
> that has been taken by Deborah. In essence,
> then [plaintiff] is asking that the Board
> referee a dispute between her and Deborah, and
> that the Board act as a fact-finder to resolve
> that dispute before acting in accordance with
> its statutory obligation to post a description
> regarding the resignation on the profile. The
> Board specifically declines to act in that
> capacity, finding nothing in the relevant
> statutes that would require the Board to act
> in that capacity.

On November 5, 2008, plaintiff filed a verified complaint and an order to show cause against Deborah and the Board seeking injunctive relief to restrain the Board from changing her physician profile and ordering Deborah to retract its report. On February 4, 2009, the court issued a temporary injunction and, on April 6, 2009, a preliminary injunction. In a written opinion, the court explained that without deciding "whether [p]laintiff possessed any knowledge of her review before departing Deborah[,]" the court was satisfied that "a certain degree of awareness is necessary" in

order "for [N.J.S.A.] 26:2H-12.2(b)(a)(3) to apply." According to the court, although "[t]he statute itself does not require that the facility give notice that the physician is under investigation[,] . . . due process consideration[s] require the statute to be interpreted to require some cognizance by the physician in order for the statute to impose the significant sanction its operations imposes."

On July 22, 2009, plaintiff amended her complaint to add McGrath, Ojserkis, and other unknown defendants, as well as tort claims and claims under the Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -42. On April 30, 2010, the court granted Ojserkis' motion to dismiss the claims against her, finding that Ojserkis' notice to the Board on behalf of Deborah was absolutely protected by the litigation privilege and thus not actionable. On January 5, 2011, plaintiff and the Board reached a confidential settlement agreement, resulting in the Board's dismissal from the litigation.[5] On March 24, 2011, plaintiff filed a second amended verified complaint adding Ernst as a defendant.

After extensive motion practice related to various discovery disputes, defendants moved for summary judgment on October 12, 2012. In opposing the motion, plaintiff certified that "at no

---

[5] Ultimately, no change was made to plaintiff's physician profile.

A-0244-13T2

time during [her] employment at Deborah nor during the period following [her] employment at Deborah was [she] ever notified or made aware about this alleged review, committee meeting, or ever notified in any way regarding Deborah's alleged review process." She certified that "in his less than two minute call to [her,]" Gallagher

> did not inform [her] of any problems with [her] own work but that [she] interpreted his brief comment to refer to the problems which existed throughout the institution at that time. Because [she] was aware of retaliatory efforts on the part of Deborah to harm physicians after their resignation, and had not informed anyone even then of [her] plans, [she] determined to make [her] resignation effective immediately as [she] had already committed [her] position at [Penn].

Following oral argument, in a May 13, 2013 written decision, the court granted defendant's motion and dismissed plaintiff's second amended complaint with prejudice. The court ruled that "the Cullen Act, . . . N.J.S.A. 26:2H-12.2b[,] expressly provides that a health care entity shall notify the division in writing if a health care professional employed by the entity resigns while the professional's patient care is being reviewed by the employer" regardless "of whether notice of the review was provided to the health care professional." The court observed that

> [t]o conclude otherwise would allow the health care professional's resignation to prevent the hospital from making the report of the

14

> investigation of the professional's patient care. This would mean that a health care professional who had the slightest inkling an investigation was underway, but who had not been formally advised of same by the health care entity, could thwart the investigation by ending his or her employment. This would effectively serve to defeat one of the purposes of the Cullen Act, "the weeding out of problem practitioners."

The court rejected "plaintiff's contention that she was not under review when she resigned[,]" finding that the "focused review" undertaken by defendant into whether "[plaintiff] was performing unnecessary medical procedures and misrepresenting outcome data . . . fell within the ambit of N.J.S.A. 26:2H-12.2b[.]"

The court then addressed each of plaintiff's claims individually. As to counts one and two of the amended complaint, the court determined that plaintiff was not entitled to permanent injunctive relief because "Deborah was required by the Cullen Act to file the report with [the Board]." Further,

> plaintiff will not suffer any immediate irreparable harm if Deborah does not retract its . . . report [to the Board] because since the time of the reporting, plaintiff's income has increased, she cannot identify anyone who thinks less of her as a result of the reporting, she is in good standing in the hospitals where she currently works, and she has no plans to apply for credentials at any other hospital in the near future.

As to count six, alleging Deborah maliciously prosecuted plaintiff in violation of N.J.S.A. 2A:47A-1 by making the report

15

to the Board and responding to credentialing requests from other institutions, the court determined that the litigation privilege and the Cullen Act, N.J.S.A. 26:2H-12.2b(g), immunized defendants from plaintiff's claims. The court noted that while the Cullen Act "makes exceptions to immunity" in cases "where the entity made the report with malice and bad faith[,]" plaintiff failed to present "any evidence whatsoever of malice or bad faith on the part of Deborah." Likewise, the court determined "that plaintiff failed to establish that Deborah instituted its investigation with malice" or "that there was an absence of probable cause for the proceeding."

As to counts four, five and seven, alleging defendants published three defamatory communications, specifically the report to the Board, the McKeever Memo and other information provided to other credentialing bodies, the court concluded that the alleged defamatory statements were true and have not "prevented plaintiff from securing other employment in her chosen profession." Moreover, according to the court, because "the alleged defamatory statements involve matters of public concern[,]" requiring plaintiff to show "actual malice[,]" plaintiff's claims failed because she "failed to show defendants published any of them with actual malice or that any of the statements . . . can be construed as 'defamatory.'"

The court also determined that in the absence of evidence of defamation, fraud, deceit, or misrepresentation, plaintiff failed to make out a prima facie case for tortious interference with prospective economic advantage as alleged in counts three and eleven, particularly since plaintiff could not establish loss of prospective gain. In addition, finding no evidence to support any of plaintiff's LAD claims, the court dismissed the remaining counts of the complaint.[6] A memorializing order was entered on June 3, 2013.

The court denied plaintiff's motion for reconsideration in an oral decision rendered on August 2, 2013. The court determined "[p]laintiff has not provided the [c]ourt with a particularly compelling reason for the [c]ourt to reconsider its decision[.]" The court explained:

> Plaintiff has made absolutely no new arguments in this motion for reconsideration, instead, simply has revised her arguments that she previously made but varies her emphasis on the Cullen Act and other evidence.
>
> . . . [T]he [c]ourt had adequately and properly addressed all the arguments plaintiff now rehashes in this motion for reconsideration.
>
> More importantly, plaintiff does not qualify for reconsideration because there is

---

[6] The court dismissed count ten alleging civil assault and a violation of the LAD, finding "absolutely no evidence to establish a claim of assault in this matter."

> no evidence to suggest the [c]ourt's decision was palpably wrong or irrational or that the probative evidence was ignored.

A memorializing order was entered on August 15, 2013, and this appeal followed.

## II.

On appeal, plaintiff argues that the "court erred because it failed to construe the proofs in plaintiff's favor per Brill, supra, ignored the conclusions a reasonable factfinder can make based on the proofs, and failed to apply the plain terms of the Cullen Act to these reasonable conclusions." Plaintiff also asserts the court "erred in ruling that the 'litigation privilege' immunizes Deborah and its agents as a matter of law." According to plaintiff, on the contrary, "Deborah and its agents are not immune as a matter of law for what a reasonable jury could find has been the publication of malicious lies designed to damage plaintiff's reputation and ability to compete." Additionally, plaintiff asserts that "[s]ummary judgment should not have been granted without plaintiff having had the chance to depose Dr. Al-Bassam[,]" the author of Medical Peer Review's reports which were disputed by plaintiff's expert.[7]

_____

[7] During oral argument, plaintiff withdrew her challenge to the court's dismissal of her LAD claims. Accordingly, we deem those claims waived.

We review a ruling on a motion for summary judgment de novo, applying the same standard governing the trial court. Templo Fuente De Vida Corp. v. National Union Fire Ins. Co., 224 N.J. 189, 199 (2016). Thus, we consider, as the motion judge did, "whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non[-]moving party." Brill, supra, 142 N.J. at 540. If there is no genuine issue of material fact, we must then "decide whether the trial court correctly interpreted the law." DepoLink Court Reporting & Litig. Support Servs. v. Rochman, 430 N.J. Super. 325, 333 (App. Div. 2013) (quoting Massachi v. AHL Servs., Inc., 396 N.J. Super. 486, 494 (App. Div. 2007)). We review issues of law de novo and accord no deference to the trial judge's legal conclusions. Nicholas v. Mynster, 213 N.J. 463, 478 (2013). "[F]or mixed questions of law and fact, [we] give[] deference . . . to the supported factual findings of the trial court, but review[] de novo the lower court's application of any legal rules to such factual findings." State v. Pierre, 223 N.J. 560, 577 (2015) (quoting State v. Harris, 181 N.J. 391, 416 (2004)).

This standard compels the grant of summary judgment "if the pleadings, depositions, answers to interrogatories and admissions

on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). "To defeat a motion for summary judgment, the opponent must 'come forward with evidence' that creates a genuine issue of material fact." Cortez v. Gindhart, 435 N.J. Super. 589, 605 (App. Div. 2014) (quoting Horizon Blue Cross Blue Shield of N.J. v. State, 425 N.J. Super. 1, 32 (App. Div. 2012)), certif. denied, 220 N.J. 269 (2015). "[C]onclusory and self-serving assertions by [a party] are insufficient to overcome the motion[.]" Puder v. Buechel, 183 N.J. 428, 440-41 (2005).

A trial court's order on a motion for reconsideration will not be set aside unless shown to be a mistaken exercise of discretion. Fusco v. Bd. of Educ. of City of Newark, 349 N.J. Super. 455, 462 (App. Div.), certif. denied, 174 N.J. 544 (2002). Reconsideration should only be granted in those cases in which the court had based its decision "upon a palpably incorrect or irrational basis," or did not "consider, or failed to appreciate the significance of probative, competent evidence." Ibid. (quoting D'Atria v. D'Atria, 242 N.J. Super. 392, 401 (Ch. Div. 1990)). A motion for reconsideration must "state with specificity the basis on which it is made, including a statement of the matters or controlling decisions which counsel believes the court has

20

overlooked or as to which it has erred[.]" R. 4:49-2. It is against these standards that we evaluate defendants' substantive arguments.

The Cullen Act requires health care entities to notify the Board of Medical Examiners when physicians in their employ resign while under review for their patient care or conduct adversely affecting patient care or safety. N.J.S.A. 26:2H-12.2b(a)(3). N.J.A.C. 13:45E-3.1(a)(4) provides:

> The health care professional voluntarily relinquishes any partial clinical privilege or authorization to perform a specific procedure if:
>
> i. Whether or not known to the health care professional, the health care entity is undertaking an investigation or a review of:
>
> (1) The quality of patient care rendered by the health care professional to determine if the care could have had adverse consequences to the patient[.]

Similarly, under N.J.S.A. 26:2H-12.2b(h), notification provided to the Board pursuant to N.J.S.A. 26:2H-12.2b(a)(3) does not require notice to "the health care professional who is the subject of [the] notice[.]"

N.J.S.A. 26:2H-12.2c also requires a health care entity to disclose, in response to inquiries by other health care entities,

A-0244-13T2

whether it had made a disclosure to the licensing board pursuant to N.J.S.A. 26:2H-12.2b relating to the health care professional in question. Specifically, N.J.S.A. 26:2H-12.2c(a)(1) provides:

> a. A health care entity, upon the inquiry of another health care entity, shall truthfully:
>
> (1) disclose whether, within the seven years preceding the inquiry, it provided any notice to the division . . . with respect to the health care professional about whom the inquiry has been made, providing a copy of the form of notification and any supporting documentation that was provided to the division, a professional or occupational licensing board in the Division of Consumer Affairs in the Department of Law and Public Safety, or the review panel[.]

If a health care entity fails to make the requisite disclosures, it is subject to the imposition of penalties as determined by the Department of Health. N.J.S.A. 26:2H-12.2c(d); N.J.S.A. 26:2H-12.2b(f). However, if the "health care entity[] or any employee" complies with the reporting mandate, and makes a disclosure "in good faith and without malice," the entity or employee will not be "liable for civil damages in any cause of action arising out of the provision or reporting of the information." N.J.S.A. 26:2H-12.2b(g); N.J.S.A. 26:2H-12.2c(c).

Although the terms "good faith" and "malice" were not defined in the Cullen Act, good faith has been defined as "honesty of

22

purpose and integrity of conduct with respect to a given subject." Marley v. Palmyra, 193 N.J. Super. 271, 293-94 (App. Div. 1983) (quoting Smith v Whitman, 39 N.J. 397, 405 (1963)). Good faith equates "with fidelity, loyalty[,] . . . bona fides[,]" and "honesty of intention and freedom from knowledge of circumstances which ought to put the holder upon inquiry." Id. at 294 (quoting Siano v. Helvering, 13 F. Supp. 776, 780 (D.N.J. 1936))). The inquiry is not, however, limited to defendants' subjective belief. "[T]he applicable standard of good faith involves both 'objective' and 'subjective' elements." Endress v. Brookdale Cmty. Coll., 144 N.J. Super. 109, 134 (App. Div. 1976).

In Hurwitz v. AHS Hosp. Corp., 438 N.J. Super. 269 (App. Div. 2014), we defined malice in the context of the immunity provided to members of hospital review committees. See N.J.S.A. 2A:84A-22.10. We stated that "the conventional meaning of that term suggests that the sanctioned physician must prove that the hospital defendants acted, in essence, either with ill will, without just cause, or with a reckless disregard of the truth of the facts regarding the physician's quality of care." Hurwitz, supra, 438 N.J. Super. at 299-300.

In the present case, we are satisfied that defendants acted "in good faith and without malice," and we discern no reason to reverse the grant of summary judgment or denial of plaintiff's

motion for reconsideration. While there is no doubt that plaintiff had disagreements with members of Deborah's medical staff, including DeBerardinis and Ng, the source of the complaints, Deborah's actions leading to the review of her patient care were objectively reasonable and entitles defendants to the immunity provided by the Cullen Act.

Contrary to plaintiff's assertion, she was under review for her patient care at the time of her resignation. Deborah was not required to disclose the review to plaintiff, and the Cullen Act required Deborah to report her resignation or be subjected to civil penalties. N.J.S.A. 26:2H-12.2c(d); N.J.S.A. 26:2H-12.2b(f). Plaintiff need not be aware of the review in order for her resignation to be a triggering event mandating the requisite notification, and notice of the report to the Board need not be provided to plaintiff. N.J.S.A. 26:2H-12.2b(h).

In addition to the notification to the Board, in response to inquiries by other health care entities, Deborah was required under N.J.S.A. 26:2H-12.2c(a)(1) to disclose whether it had made such a notification to the Board within the seven years preceding the inquiry, providing a copy of the form of notification and any supporting documentation that was provided. The McKeever Memo and McGrath's response were good faith attempts at compliance with those statutory requirements.

Finally, plaintiff failed to show actual malice, as required by the statute. "A bare allegation of malice is insufficient to defeat immunity if the defendant acted in an objectively reasonable manner." Connor v. Powell, 162 N.J. 397, 409 (2000). Deborah acted with due care in the evaluation of the accusations leveled against plaintiff. Deborah acknowledged that the accusations could have been motivated by personal animosity and engaged an external reviewer to eliminate the possibility of a tainted peer review. This methodology promoted the dual interests of both the patients and plaintiff. The timing of plaintiff's resignation was unfortunate in that it triggered the statutorily required reporting.

The court predicated its dismissal of the complaint on its ruling that defendants were protected by both the immunity provided by the Cullen Act and the common law litigation privilege. The litigation privilege protects "[c]ertain statements made in the course of judicial, administrative, or legislative proceedings . . . because of 'the need for unfettered expression critical to advancing the underlying government interest at stake in those settings.'" Zaqami, LLC v. Cottrell, 403 N.J. Super. 98, 104 (App. Div. 2008) (quoting Erickson v. Marsh & McLennan Co., Inc., 117 N.J. 539, 563 (1990)). "[T]he litigation privilege has been expanded . . . to encompass so-called quasi-judicial proceedings"

as well as "statements made . . . in connection with a judicial or quasi-judicial proceeding." Id. at 105-06. In addition, the privilege is not "limited necessarily to statements made under oath." Id. at 107.

In Cottrell, supra, after analyzing the application of the privilege in a variety of contexts, we concluded:

> We discern from these cases the guiding principle that, outside the strictly judicial setting, application of the litigation privilege will depend on the nature of the administrative proceeding, the function performed, and the pertinency of the allegedly defamatory statement to the issues and contentions to be resolved. As to the former, we look especially to the organic act governing the administrative agency to determine the presence of such procedural safeguards as notice, hearing, neutrality, finality, and review and to ascertain whether the proceeding affects only purely private interests or is imbued with a greater public significance. Of course whether a defendant in a defamation action is entitled to assert the absolute privilege for statements made during the course of litigation is a question of law.
>
> [Id. at 108-09.]

Here, there is little question that the notification to the Board triggered an action covered by the litigation privilege. Plaintiff was provided notice and an opportunity to be heard before a neutral review board, as well as the opportunity to appeal the Board's determination prior to any change to her physician profile.

26

This procedure provided sufficient safeguards "to protect plaintiff from the allegedly false and malicious statements uttered by defendants, and to therefore shield defendants with the cloak of absolute immunity." Id. at 110. This privilege immunizes defendants from tort claims arising out of the notification made to the Board, with the exception of the malicious prosecution claim. See Brien v. Lomazow, 227 N.J. Super. 288, 305 (App. Div. 1988) (holding "immunity exists unless plaintiffs can make a colorable claim of malicious prosecution.").

However, in light of our determination regarding the applicability of the statutory immunity of the Cullen Act, we are satisfied that the policy behind the enactment of the Cullen Act also protects defendants from recovery for a malicious prosecution claim. The fact that defendants had a legal duty to report the information compels that conclusion. Because all the counts allege related torts and are predicated upon the same conduct, defendants are shielded from all civil liability arising out of the provision or reporting of the information, and plaintiff is not entitled to injunctive relief. Therefore, plaintiff's entire complaint was properly dismissed.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

27                                                          A-0244-13T2